ALTO LITIGATION, PC
  Bahram Seyedin-Noor (Bar No. 203244)
  bahram@altolit.com
  Daniel Sakaguchi (Bar No. 222722)
  daniel@altolit.com
  Joshua Korr (Bar No. 304577)
  josh@altolit.com
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Telephone: (415) 779-2586
Facsimile: (866) 654-7207

Attorneys for Plaintiff,
US Capital/Noble Capital Texas Real Estate Income Fund, LP

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA,**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| US CAPITAL/NOBLE CAPITAL TEXAS REAL ESTATE INCOME FUND, LP,<br><br>Plaintiff,<br><br>v.<br><br>JADON NEWMAN, CHRIS RAGLAND, ROMNEY NAVARRO, GRADY COLLINS, JFN GRANTOR TRUST, N.A. NEWMAN HERITAGE TRUST, K.A. NEWMAN HERITAGE TRUST, RAGLAND HOLDINGS, LLC, NOBLE CAPITAL GROUP, LLC, NOBLE CAPITAL FUND MANAGEMENT, LLC, NOBLE CAPITAL PROPERTIES, LLC, NOBLE CAPITAL SERVICING, LLC, NOBLE CAPITAL REAL ESTATE, LLC (f/k/a EMERGE REAL ESTATE GROUP, LLC), STREAMLINE FUNDING GROUP, LLC, NOBLE CAPITAL REO, LLC, NOBLE CAPITAL INCOME FUND II, LLC, NOBLE CAPITAL INCOME FUND III, and DOES 1-50,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR:**<br><br>(1) **CIVIL RICO (18 U.S.C. § 1962(c));**<br>(2) **CIVIL RICO (18 U.S.C. § 1962(d));**<br>(3) **FRAUD;**<br>(4) **FALSE ADVERTISING (15 U.S.C. § 1125);**<br>(5) **UNFAIR COMPETITION (Cal. Bus. & Prof. Code §§ 17200 *et seq.* and 17500 *et seq.*);**<br>(6) **BREACH OF CONTRACT (the MASA);**<br>(7) **BREACH OF CONTRACT (the MOUs);**<br>(8) **CONVERSION;**<br>(9) **UNJUST ENRICHMENT**<br><br>**DEMAND FOR JURY TRIAL** |

COMPLAINT

# TABLE OF CONTENTS

JURISDICTION AND VENUE ....................................................................................... 1

PARTIES................................................................................................................................ 3

SUBSTANTIVE ALLEGATIONS .................................................................................... 6

I.   Overview ...................................................................................................................... 6

II.  The Individual Defendants Organized an
     Enterprise Consisting of Numerous Alter Ego Entities ..................................... 8

III. Noble Capital's Obligations to the Fund ............................................................. 10

IV.  The Individual Defendants and Noble Capital
     Defraud the Fund into Taking Bad Loans for Their Personal Gain ................ 12

V.   The Individual Defendants and Noble Capital
     Engage in False Advertising and Unfair Competition ...................................... 16

     A.   Defendants Falsely Promise Guaranteed No-Risk Returns,
          Then Attempt to Manipulate Results to Meet Those Goals
          and Mislead Investors About Performance ............................................. 17

          1.   Defendants Mislead Investors by Promising Guaranteed Returns ...... 17

          2.   Having Set False Expectations, Defendants
               Mislead Investors About the Substantial
               Losses Incurred on Their Behalf ................................................. 20

     B.   Defendants Use the Fund's CUSIP, Goodwill,
          Name, and Reputation to Mislead Investors ........................................ 22

     C.   Defendants Lie to Investors About Past Bankruptcies and Leverage ............. 24

     D.   Defendants Issue Improper Schedule K-1s to Investors ................................. 26

VI.  Defendants Convert the Fund's Assets, Causing Millions
     in Further Losses .......................................................................................... 27

**COUNT ONE - Civil Violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962(c)) (Against All Defendants)** .............. 29

**COUNT TWO Civil Violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962(d)) (Against All Defendants)** ......................................... 32

**COUNT THREE Fraud (Against the Individual Defendants Ragland, Collins, and Noble Capital Fund Management)** ......................................................... 32

**COUNT FOUR False Advertising (15 U.S.C. § 1125) (Against the Individual Defendants, Noble Capital Group, Noble Capital Fund Management Income Fund II, and Income Fund III)** ......................................... 34

**COUNT FIVE  Unfair Competition (Cal. Bus. & Prof. Code §§ 17200 et seq. and 17500 et seq.) (Against the Individual Defendants, Noble Capital Group, Noble Capital Fund Management Income Fund II, and Income Fund III)** ......................................... 35

**COUNT SIX    Breach of Contract – The MASA (Against Noble Capital Fund Management)** ......................................... 36

**COUNT SEVEN Breach of Contract – The MOU (Against Noble Capital Properties)** ......................................... 38

**COUNT EIGHT Conversion (Against Noble Capital Properties)** ......................................... 39

**COUNT NINE  Unjust Enrichment (Against All Defendants)** ......................................... 40

**PRAYER FOR RELIEF** ......................................................................... 40

**DEMAND FOR JURY TRIAL** ......................................................... 42

Plaintiff, US CAPITAL/NOBLE CAPITAL TEXAS REAL ESTATE INCOME FUND, LP (the "Fund"), by and through the undersigned counsel hereby files and serves this Complaint for Civil Violations of the Racketeer Influenced and Corrupt Organizations Act, Fraud, False Advertising, Unfair Competition, Breach of Contract, Conversion, and Unjust Enrichment against JADON NEWMAN ("Newman"), CHRIS RAGLAND ("Ragland"), ROMNEY NAVARRO ("Navarro"), GRADY COLLINS ("Collins"), JFN GRANTOR TRUST ("JFN Trust"), N.A. NEWMAN HERITAGE TRUST ("NA Newman Trust"), K.A. NEWMAN HERITAGE TRUST ("KA Newman Trust), RAGLAND HOLDINGS, LLC, ("Ragland Holdings"), NOBLE CAPITAL GROUP, LLC ("Noble Capital Group"), NOBLE CAPITAL FUND MANAGEMENT, LLC ("Noble Capital Fund Management"), NOBLE CAPITAL PROPERTIES, LLC ("Noble Capital Properties"), NOBLE CAPITAL SERVICING, LLC ("Noble Capital Servicing"), NOBLE CAPITAL REAL ESTATE, LLC f/k/a EMERGE REAL ESTATE GROUP, LLC ("Noble Capital Real Estate"), STREAMLINE FUNDING GROUP, LLC ("Streamline"), NOBLE CAPITAL REO, LLC ("Noble Capital REO"), NOBLE CAPITAL INCOME FUND II, LLC ("Income Fund II"), NOBLE CAPITAL INCOME FUND III, LLC ("Income Fund III"), and DOES 1-50 (collectively "Defendants").

## JURISDICTION AND VENUE

1.      This Court possesses diversity jurisdiction pursuant to 28 U.S.C. § 1332.

2.      The amount in controversy between the parties exceeds $75,000.00.

3.      This Court possesses federal question jurisdiction pursuant to 28 U.S.C. § 1331.

4.      This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 1125 and 18 U.S.C. § 1962.

5.      Personal jurisdiction is proper as to Defendant Newman because:  (1) Defendant Newman  purposefully availed himself of the benefits of the State of California; (2) the controversy is related to and arises out of Defendant Newman's contacts with the State of California; and (3) the assertion of personal jurisdiction comports with fair play and substantial justice.

6.      Personal jurisdiction is proper as to Defendant Ragland because:  (1) Defendant Ragland purposefully availed himself of the benefits of the State of California; (2) the controversy is related to and arises out of Defendant Ragland's contacts with the State of California; and (3) the assertion of personal jurisdiction comports with fair play and substantial justice.

7.      Personal jurisdiction is proper as to Defendant Navarro because:  (1) Defendant Navarro purposefully availed himself of the benefits of the State of California; (2) the controversy is related to and arises out of Defendant Navarro's contacts with the State of California; and (3) the assertion of personal jurisdiction comports with fair play and substantial justice.

8.      Personal jurisdiction is proper as to Defendant Collins because:  (1) Defendant Collins purposefully availed himself of the benefits of the State of California; (2) the controversy is related to and arises out of Defendant Collins's contacts with the State of California; and (3) the assertion of personal jurisdiction comports with fair play and substantial justice.

9.      Personal jurisdiction is proper as to Defendant Noble Capital Group because:  (1) Noble Capital Group purposefully availed itself of the benefits of the State of California; (2) the controversy is related to and arises out of Noble Capital Group's contacts with the State of California; and (3) the assertion of personal jurisdiction comports with fair play and substantial justice.

10.     Personal jurisdiction is proper as to Defendant Noble Capital Fund Management because:  (1) Noble Capital Fund Management purposefully availed itself of the benefits of the State of California; (2) the controversy is related to and arises out of Noble Capital Fund Management's contacts with the State of California; and (3) the assertion of personal jurisdiction comports with fair play and substantial justice.

11.     Personal jurisdiction is proper as to Defendant Noble Capital Servicing because: (1) Noble Capital Servicing purposefully availed itself of the benefits of the State of California; (2) the controversy is related to and arises out of Noble Capital Servicing's contacts with the State of California; and (3) the assertion of personal jurisdiction comports with fair play and substantial justice.

12.     Personal jurisdiction is proper as to Noble Capital Properties because: (1) Noble Capital Properties purposefully availed itself of the benefits of the State of California; (2) the controversy is related to and arises out of Noble Capital Properties' contacts with the State of California; and (3) the assertion of personal jurisdiction comports with fair play and substantial justice.

13.     Personal jurisdiction is proper in this Court as to Defendants Noble Capital Real Estate, Streamline, Noble Capital REO, Income Fund II, Income Fund III, JFN Trust, NA Newman Trust, KA Newman Trust, and Ragland Holdings (collectively, the "Added Defendants"). The Added Defendants purposefully availed themselves of the benefits of the State of California and intentionally took part in a conspiratorial enterprise which damaged the Fund, a limited partnership with its principal place of business in California, with knowledge that their actions would cause harm in California. Personal jurisdiction is also proper in this Court as to the Added Defendants because this Court already has jurisdiction over at least one of the participants in the alleged conspiracy, and "the ends of justice" require such jurisdiction in this matter pursuant to 18 U.S.C. § 1965(b).

14.     Venue is proper in this jurisdiction pursuant to 28 U.S. Code § 1391 because a substantial part of the events giving rise to the claims occurred in the Northern District of California. Defendants conducted business in California and engaged in many of the acts alleged in the course of that business, including traveling to California to conduct negotiations regarding the subject matter of the Complaint.

## PARTIES

15.     The Fund is a limited partnership created pursuant to the laws of the State of Delaware with its principal place of business located at 555 Montgomery Street, Suite 1501, San Francisco, California.

16.     Defendant Jadon Newman holds himself out to the public as the Chief Executive Officer of Noble Capital Group and various additional Noble Capital entities. On information and belief, Newman is a resident of Texas. Newman is a manager and member of Noble Capital Group.

17.     Defendant Chris Ragland holds himself out to the public as the Chief Operating Officer of Noble Capital Group and various additional Noble Capital entities.  On information and belief, Ragland is a resident of Texas.  Ragland is a member of Noble Capital Group.

18.     Defendant Romney Navarro holds himself out to the public as the Chief Lending Officer of Noble Capital Group and various additional Noble Capital entities.  On information and belief, Defendant Navarro is a resident of Texas.  Navarro is a member of Noble Capital Group.

19.     Defendant Grady Collins holds himself out to the public as the Chief Financial Officer of Noble Capital Group and various additional Noble Capital entities.  On information and belief, Collins is a resident of Texas.  Collins is a member of Noble Capital Group.

20.     Defendant JFN Trust owns or controls a portion of Noble Capital.  On information and belief, JFN Trust was created pursuant to the laws of the state of Texas, with its principal place of business in Texas.  Defendant Newman owns and controls the JFN Trust, which is a member of Noble Capital Fund Group, Noble Capital Fund Management, and the larger Noble Capital enterprise.  All actions taken by Newman as a manager and CEO of Noble Capital were also taken by the JFN Trust as member.

21.     Defendant NA Newman Trust owns or controls a portion of Noble Capital.  On information and belief, NA Newman Trust was created pursuant to the laws of the state of Texas, with its principal place of business in Texas.  Defendant Newman owns and controls NA Newman Trust, which is a member of Noble Capital Group and the larger Noble Capital enterprise.  All actions taken by Newman as a manager and CEO of Noble Capital were also taken by NA Newman Trust as member.

22.     Defendant KA Newman Trust owns or controls a portion of Noble Capital.  On information and belief, KA Newman Trust was created pursuant to the laws of the state of Texas, with its principal place of business in Texas.  Defendant Newman owns and controls KA Newman Trust, which is a member of Noble Capital Group and the larger Noble Capital enterprise.  All actions taken by Newman as a manager and CEO of Noble Capital were also taken by KA Newman Trust as member.

23.     Defendant Ragland Holdings owns or controls a portion of Noble Capital.  On information and belief, Ragland Holdings was created pursuant to the laws of the state of Texas, with its principal place of business in Texas.  Defendant Ragland owns and controls Ragland Holdings, LLC, which is a member of Noble Capital Group and the larger Noble Capital enterprise.  All actions taken by Ragland as a manager and COO of Noble Capital were also taken by Ragland Holdings as member.

24.     Defendant Noble Capital Group is a limited liability company created pursuant to the laws of the State of Texas, with its principal place of business located at 8200 N. Mopac Expressway, #320, Austin, Texas.  Noble Capital Group is the parent entity to the other Noble Capital subsidiary entities.

25.     Defendant Noble Capital Fund Management is a limited liability company created pursuant to the laws of the State of Texas, with its principal place of business located at 8200 N. Mopac Expressway, #320, Austin, Texas.

26.     Defendant Noble Capital Servicing is a limited liability company created pursuant to the laws of the State of Texas, with its principal place of business located at 8200 N. Mopac Expressway, #320, Austin, Texas.

27.     Defendant Noble Capital Properties is a limited liability company created pursuant to the laws of the State of Texas, with its principal place of business located at 8200 N. Mopac Expressway, #320, Austin, Texas.

28.     Defendant Noble Capital Real Estate is a limited liability company created pursuant to the laws of the State of Texas, with its principal place of business located at 8200 N. Mopac Expressway, #320, Austin, Texas.

29.     Defendant Noble Capital REO is a limited liability company created pursuant to the laws of the State of Texas, with its principal place of business located at 8200 N. Mopac Expressway, #320, Austin, Texas.

30.     Defendant Streamline is a limited liability company created pursuant to the laws of the State of Texas, with its principal place of business located at 8200 N. Mopac Expressway, #320, Austin, Texas.

31.     Defendant Noble Capital Income Fund II is a limited liability company created pursuant to the laws of the State of Texas, with its principal place of business located at 8200 N. Mopac Expressway, #320, Austin, Texas.

32.     Defendant Noble Capital Income Fund III is a limited liability company created pursuant to the laws of the State of Texas, with its principal place of business located at 8200 N. Mopac Expressway, #320, Austin, Texas.

## SUBSTANTIVE ALLEGATIONS

### I.     Overview

33.     This Action is based on a wide-ranging pattern of fraudulent, unlawful, and unfair competitive conduct by four business partners:  Defendants Newman, Ragland, Navarro, and Collins (collectively, the "Individual Defendants").  The Individual Defendants own and operate dozens of corporate alter ego entities, whose activities they often discuss under the general banner of "Noble Capital," an enterprise-in-fact.

34.     On information and belief, Noble Capital's interrelated companies provide investment opportunities to high-net-worth retirees and other investors, primarily in the form of fractionalized partnerships with assets built around "hard-money" lending, *i.e.* short-term high interest construction loans to borrowers who are unable to obtain more traditional financing.

35.     Noble Capital describes it's hard-money lending business as a "vertically integrated" organization, which means that, through various corporate entities, it not only procures funds to invest, but also originates, diligences, structures, and services loans, and then manages defaulted loans on the back end through aggressive foreclosures, among other things.  At every step of the way, Noble Capital generates substantial income, in the form of advisory, origination, servicing, sales, workout fees, capital gains for cash profits, and/or capital losses for tax-loss benefits, which are taken out of the pocket of investors.

36.     Noble Capital's business depends on its highly curated—and highly misleading— general public advertising practices.  To obtain funds from investors, Noble misleads retiree and non-retiree investors in a number of ways.  It guarantees, without any basis or caveat, that it can deliver above market 8.25% returns with no risk of loss.  It falsely represents to investors that it

has obtained credentials and regulatory clearances in its own name that it has not obtained.  It freerides off of the name, credentials, and goodwill of entities like the Fund without proper attribution.  It lies to investors about its extensive history of bankruptcies, claiming instead that it has not declared bankruptcy.  It lies to investors about its leverage, falsely claiming that it is entirely unleveraged.  And it falsely represents to investors that its investment funds are not taxable as investment interest income – and goes so far as to issue improper Schedule K-1 tax documents to further that misrepresentation.

37.     The Fund, which manages approximately $25,000,000 in assets, funds high-yield senior secured first-lien mortgages on residential real-estate.  The Fund is one of Noble Capital's primary business partners, and also one of Noble Capital's primary victims.  Due to Noble Capital's misconduct, the Fund has also become one of Noble Capital's largest creditors.

38.     The Fund and Noble Capital's relationship is based on a series of contracts including a Management Advisory Services Agreement and a Limited Partnership Agreement wherein Noble Capital uses its suite of companies to manage the life-cycle of the Fund's real-estate backed loans.  But from the start, the Individual Defendants used their Noble Capital enterprise to defraud the Fund out of substantial assets.

39.     Specifically, Defendants serially furnished false and misleading credit memoranda to the Fund to induce it to fund loans that Defendants knew posed an unacceptable risk of default.  These memoranda falsely represented that borrowers' credit and background reports "came back clear," when in reality, certain borrowers had multiple foreclosures, while others were already in default to other Noble-controlled entities.

40.     As a result, 13% of the loans that Noble sourced for the Fund defaulted, casting a cloud over millions of dollars in Fund assets.  That is no coincidence, Defendants' overarching plan was to shift losses from other Noble-controlled entities to the Fund through the fraud described above, while concealing the underlying facts from the Fund.

41.     To that end, Noble has refused to provide the Fund's independent third-party auditor with access and documents requested in an attempt to hide its misdeeds from the light of

1   day and has falsely claimed that it does not have the capability to produce monthly loan statements

2   for any particular loan.

3           42.     This pattern of fraud has resulted in losses for the Fund while simultaneously

4   resulting in gains for the Individual Defendants and their Noble Capital enterprise.

5           43.     The Fund's substantial losses are compounded by the fact that Noble Capital

6   promised the Fund's investors guaranteed above-market 8.25% returns, which the Fund has been

7   unable to deliver.  This too harms the Fund while advantaging Noble Capital, because Noble

8   Capital uses the Fund's underperformance to besmirch the Fund and divert its investors into other

9   Noble-controlled funds.

10          44.     Noble's conduct, as described more fully below, has harmed the Fund

11   economically and competitively, giving rise to claims for civil violations of the Racketeer

12   Influenced Corrupt Organizations Act ("RICO"), Fraud, False Advertising, Unfair Competition,

13   Breach of Contract, Conversion, and Unjust Enrichment.

14   **II.    The Individual Defendants Organized an**
         **Enterprise Consisting of Numerous Alter Ego Entities**
15

16          45.     The Individual Defendants own and operate a web of alter-ego entities that they

17   refer to interchangeably as "Noble Capital" or "Noble" (hereafter, "Noble Capital" or "Noble").

18          46.     The Individual Defendants, who are all officers of Noble Capital and partners to

19   one another, operate Noble Capital as an enterprise-in-fact.

20          47.     As described by Defendant Newman, "[n]ot all partnerships have the dynamics and

21   the strengths that we bring to the table as the four owners of Noble Capital."  The full extent of

22   each of their involvement in the Noble Capital enterprise and its dozens of alter-ego subsidiaries is

23   still under investigation.

24          48.     Plaintiff is informed and believes, and on that basis alleges, that all of the Noble

25   Capital entities are treated as interchangeable among the Individual Defendants.  On information

26   and belief, all of the Noble Capital entities (with the possible exclusion of the trusts) reside at the

27   same address, are run by individuals who each use one @noblecapital.com e-mail address

28   regardless of what company they are acting on behalf.  On information and belief, the Individual

1   Defendants transfer assets and monies, including personal assets, in and among these entities

2   without exchanging appropriate consideration or respecting corporate formalities for illegitimate

3   purposes.

4           49.     As such, at all relevant times, the Noble Capital related entities were alter egos of

5   the Defendants Newman, Ragland, Navarro, and Collins, and alter egos of one another, in that at

6   all times there existed such a unity of interest in ownership between the Noble Capital entities and

7   the Individual Defendants and between Noble Capital subsidiary entities and one another that any

8   separateness has ceased to exist between them.

9           50.     Plaintiff is informed and believes, and on that basis alleges, that Defendants have

10   structured their enterprise-in-fact in such a way as to permit them to funnel assets into certain

11   Noble Capital entities as needed to preserve the Individual Defendants compensation, to prop up

12   the balance sheets and associated investment returns of certain Noble Capital entities, to stow

13   losses in other Noble Capital entities for purposes of opportunistic bankruptcies, and to lay blame

14   at the feet of partners, like the Fund, who are involved in certain of those entities.

15           51.     On information and belief, the Individual Defendants control or have controlled

16   several dozen limited liability companies and limited partnership entities, which they have used

17   over the past decade as vehicles to mislead business partners, competitors, and the investing public

18   about the location and size of their assets and liabilities.

19           52.     These Noble Capital entities include Noble Capital Group, Noble Capital Fund

20   Management, Noble Capital Properties, Noble Capital Servicing, Noble Capital Real Estate,

21   Streamline, and others, which hold themselves out to the public as specialists in retirement

22   investment planning, private lending of "hard money" loans, and real estate owned ("REO")

23   workouts.

24           53.     The following chart illustrates some of the key Noble Capital entities at issue in

25   this litigation:

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13



14 **III.    Noble Capital's Obligations to the Fund**

15      54.      In January and February 2017, the Individual Defendants utilized their various

16 Noble entities to enter into a series of agreements with the Fund.  One such agreement was a

17 Limited Partnership Agreement ("LPA") between the Fund and Defendants in accordance with the

18 Private Placement Memorandum (sometimes referred to as "PPM") of the Fund.

19      55.      The overarching purpose of the Fund as delineated in the LPA and PPM was to

20 preserve Fund principal and achieve consistent short-term income primarily through senior

21 secured first-lien mortgages on residential real-estate.

22      56.      The LPA provides in section 8.1 that US Capital Global Investment Management,

23 LLC will act as the Fund's general partner and have the exclusive right to manage, control, and

24 conduct the business of the Fund.  Similarly, in a "Private Placement Agreement," the Fund and

25 various Noble Capital entities, as well as the Individual Defendants, engaged US Capital Global

26 Securities, Inc. (collectively with US Capital Global Investment Management, LLC "US Capital")

27 to act as the Fund's exclusive placement agent.

28

57.     Some of the key responsibilities for effectuating the goals of the LPA and PPM were memorialized in a Management Advisory Services Agreement (the "MASA") between the Fund and Noble Capital Fund Management, which governs the Fund's business relationship with multiple Noble entities.  Pursuant to the MASA, the Noble entities agreed to:

- source, and originate prospective real estate transactions for the Fund;

- conduct due diligence on prospective borrowers;

- structure, securitize, document, and execute transactions based on due diligence;

- manage the portfolio of loans with respect to collateral monitoring, cash management, and any other activities as requested by the Fund;

- exit, and liquidate holdings; and

- repossess, restructure, or otherwise remedy properties or borrowers in events of default to preserve Fund assets.

58.     The diagram below connects the three signatories to the MASA to the purple block that represents the MASA.  The diagram then further shows the other Noble Capital entities that Noble Capital Fund Management, LLC utilized to perform its obligations under the MASA:



**IV.    The Individual Defendants and Noble Capital**
**Defraud the Fund into Taking Bad Loans for Their Personal Gain**

59.    On information and belief, the Individual Defendants, acting through their Noble Capital entities, never intended to uphold their contractual obligations to the Fund or its individual retirement account investors, and instead intended to siphon Fund assets through a coordinated scheme.

60.    The MASA tasks the Noble entities with conducting appropriate due diligence on prospective borrowers and making funding recommendations to the Fund, among other things.

61.    Yet, instead of conducting appropriate due diligence on prospective borrowers, Defendants intentionally recommended bad loans that had an unacceptable risk of default. Defendants stood to gain from those loans whether or not they performed because they obtained substantial origination and servicing fees on the front end through the entities Noble Capital Servicing, Noble Capital Fund Management, and Streamline Funding Group, and substantial workout fees and profits on the back end through the entities Noble Real Estate, Noble Capital REO, and Noble Capital Properties.

62.    Defendants scheme to defraud the Fund was effectuated through a series of false and/or highly misleading credit memoranda that were provided to the Fund to induce it to take on bad loans.

63.    For example, on April 25, 2017, Defendants sent a credit memorandum to the Fund signed by Defendant Ragland recommending that the Fund finance a loan to FDI Divine Property Group, LLC ("FDI"). According to the credit memorandum, Noble ran background reports for FDI's owners that "came back clean." But in reality, Borrower A (name omitted for confidentiality) had three foreclosures in the ten-year period leading up to this promissory note, the most recent of which was recorded in March 2016. Even worse, Noble Capital had actually entered into this loan in July 2016, a mere four months after that recent foreclosure. Thus, by the time the Fund was brought into the transaction, Noble had been dealing with FDI and its owners for nine months. Soon after the Fund stepped in, FDI defaulted on the loan.

64.     Similarly, on April 20, 2017, Defendants sent a credit memorandum signed by Defendants Ragland and Collins to the Fund recommending that it fund a loan to Northshore Homes.  As with the previous loan, the credit memorandum stated that all background checks "came back clear."  But a title, lien, and registration report on Northshore Homes reveals that it has had 17 foreclosures and 18 judgments entered against it.  On information and belief, many or all of those predated the loan that Noble Capital recommended.  Furthermore, as with other bad loans, Noble Capital had actually entered into this loan seven months before it recommended it to the Fund.  Accordingly, Noble knew or recklessly disregarded the fact that it would go into default, which is exactly what happened.

65.     As a final example, on September 25, 2017, Defendants sent a credit memorandum signed by Defendant Collins to the Fund recommending that it fund a loan to Loved Homes of Austin, LLC ("Loved Homes").  The credit memorandum was issued in support of the transaction and noted that all background checks "came back clear."  As with the loans to FDI and Northshore Homes, Noble Capital had actually entered into the loan with Loved Homes much earlier, on October 26, 2016, eleven months before it recommended the loan to the Fund.  Remarkably, Noble Capital itself caused a notice of default to be filed on behalf of James Wiggins against Loved Homes just *three months* before it recommended that the Fund step in with funding.  As with the other bad loans, Loved Homes quickly defaulted.

66.     As an additional fraudulent element of all three of the transactions described above, Defendants misled the Fund into believing that Noble Capital had tightened its diligence process to ensure that borrowers had appropriate experience and credentials, among other things.  Defendant Ragland described these "credentials" as follows:  "If they don't know what they're doing, if they haven't done it before, there's no reason we should give them a loan and let them try it out on us.  So if they don't have experience or credentials, not gonna' happen."  *See* https://www.youtube.com/watch?v =a36wkjzTr0A (last accessed May 17, 2019 at 2:57 p.m.).  Borrowers with lengthy foreclosure histories or very recent defaults very obviously do not have "credentials."

67.    Plaintiff's investigation is ongoing, but Plaintiff expects to uncover additional acts of fraud and misconduct by Defendants.

68.    As a result of Defendants' fraudulent credit memoranda and intentional diligence failures, 13% of the loans that Defendants originated for the Fund defaulted.  Many of the defaults were "early payment defaults," which is an industry term of art for loans that are so atrocious that the borrower defaults without ever making a single payment.  Per the Fund's analysis in April 2018, Defendants originated six bad loans amounting to $2.2M—or approximately 17% of the Fund's Assets.

69.    Part of Defendants' overarching plan was to defraud the Fund into taking on bad debt from other Noble-controlled entities.  This served Defendants' unlawful enterprise scheme because it allowed Defendants to conceal losses in other Noble subsidiaries by transferring them to the Fund.  The Fund is informed and believes, and on that basis alleges, that this was Defendants' *modus operandi* dating back nearly a decade, and it has enabled them to extract additional money from their scheme from a wider pool of individuals over a lengthy timeframe.  As a result, the Fund has discovered at investor events that it is not the only victim of the Noble Capital scheme.

70.    For example, the Fund is informed and believes, and on that basis alleges that, in a non-Fund transaction, Noble Capital recommended a borrower who previously had numerous foreclosures entered against him.  His loans through Noble went into foreclosure, which caused losses.  Yet Noble profited—in addition to the substantial origination and servicing fees it obtained on the front end, most of the renovation work on the subject properties had been completed at the time of default, which resulted in a windfall for Defendants on the back end.  Making matters worse, the borrower on that loan has publicly stated that Defendants forced this property into foreclosure by wrongfully denying a final draw on his loans, to cause a default.

71.    When the Fund brought Defendants' unacceptably high-default rate to their attention in Q2 2018, Defendants agreed to purchase the defaulted loans from the Fund.  As described more fully *infra* at Part VI, this led to a separate set of wrongful conduct by Defendants that damaged the Fund.

72.     In addition to the defaults already described, Defendants purchased a further set of defaulted loans in Q3 and Q4 2018.  These loans amounted to approximately 5% of all loans Defendants originated for the Fund.

73.     Just like the initial set of bad loans, some of these were early payment defaults. The Fund has been forced to seek out a third-party servicer for collections and workouts for these additional loans.

74.     Defendants have kept the substantial loan origination fees generated by these loans. On information and belief, Defendants have also pocketed substantial gains from foreclosing on the properties that secured the defaulted loans, and indeed, have converted many of these properties for their own gain, as set forth further below.

75.     Defendants did this by entering into loans that posed an unacceptable degree of risk so that they could generate origination and servicing fees on the front end, and work-out fees and other REO-related windfalls on the back end, all while attempting to conceal the losses that they were incurring from the Fund and its investors.

76.     Defendants were motivated to transact with the Fund to obtain certain certifications and credentials that the Fund – but not Defendants – had the qualifications and wherewithal to obtain.  Defendants used these valuable credentials to mislead investors into thinking that Noble entities had gone through third-party diligence and audit processes, and received certifications and approvals, that they had not gone through or obtained.

77.     Defendants were further motivated to transact with the Fund to increase their amount of funds under management (which they generate proportional fees from), to establish essentially a revolving line of $25,000,000 credit through the Fund's assets under management, to be able to draw on that credit to fund loans without having to cobble together a group of individual investors (which was Noble's pre-Fund practice), to access the lending market for deals greater than $500,000 (which Noble was unable to consistently access prior to its partnership with the Fund), and to freeride off of the fact that the Fund is audited annually by a neutral third-party (which high-net-worth investors understand and care about).

**V.     The Individual Defendants and Noble Capital
        Engage in False Advertising and Unfair Competition**

78.     Defendants' scheme goes well beyond harming the Fund's existing assets under management and extends to the Fund's reputation, goodwill and business opportunities.

79.     Defendants' business revolves around a curated assortment of folksy marketing techniques that are, in fact, an overarching false advertising scheme.  Defendants solicit investors through steakhouse "retirement seminars," quarterly "state of the company" seminars, and other informational events featuring wine, "brews," and "authentic Texas BBQ."  At these events, high-net-worth retirees and other potential investors are treated to free food and alcohol, before imbibing Noble Capital's misleading and false investment advertising.

80.     Below is an image of the web portal for Noble Capital's upcoming events, which was captured from noblecapital.com/resources/events on May 7, 2019 at 3:07 p.m.

NOBLE CAPITAL / EVENTS



RETIREMENT SEMINARS



STATE OF THE COMPANY

81.     The individuals in the image above in the righthand column are, from left to right, Defendant Newman, Defendant Collins, Defendant Ragland, and Defendant Navarro.

82.     Defendants use a similar folksy approach to create a false sense of security and trust via their online and print marketing scheme.  Among other things, Defendants' have created

1    multiple "candid" interviews with Newman, Collins, and Ragland, numerous other highly

2    produced but misleading advertising videos, and a weekly radio show, all of which contain

3    numerous misrepresentations.

4          83.    Noble Capital's systematic pattern of misrepresentation, false advertising and

5    unfair competition against the Fund includes, without limitation, the following specific acts, which

6    are described further in the sections that follow:

7          (A) falsely promising guaranteed no-risk returns, then attempting to manipulate cost

8                accounting to meet those goals and attributing shortfalls to the Fund;

9          (B) freeriding off of the Fund's CUSIP, goodwill, name, and reputation, to divert investors

10               into their own wholly-controlled investment vehicles;

11         (C) unfairly competing with the fund by misleading investors about Noble Capital's

12               extensive bankruptcy history and falsely claiming to be unleveraged; and

13         (D) falsely advertising and issuing improper Schedule K-1 tax documents.

14         84.    Defendants false and misleading statements are attributed either to the individual

15   Defendants directly, as described more specifically below, or more generally to Noble Capital or

16   Noble without specific attribution.  Noble Capital Group and Noble Capital Fund Management are

17   the primary entities who use those statements to funnel investors into Noble-controlled funds.

18         85.    On information and belief, Defendants have diverted millions of dollars in

19   investment monies from the Fund through Defendants' false advertising scheme and caused other

20   financial and regulatory harms to the Fund.

21   **A.    Defendants Falsely Promise Guaranteed No-Risk Returns, Then Attempt to
        Manipulate Results to Meet Those Goals and Mislead Investors About**
22   **      Performance**

23         **1.    Defendants Mislead Investors by Promising Guaranteed Returns**

24         86.    Defendants improperly and misleadingly advertise the Fund, as well as several of

25   Noble Capital's other investment offerings, as guaranteeing a higher-than-market return, without

26   any disclosure of the risk of loss.  They then seek to manipulate actual returns to mislead investors

27   about the substantial losses they have incurred.

28

1    87.    For example, on January 23, 2018, Noble Capital published to its website an

2  advertisement for the Fund without obtaining the Fund's consent that promises investors an

3  "8.25%* annual return."  A copy of this advertisement is attached here as **Exhibit A**.

4  Remarkably, the "*" icon directs the reader to a footnote which, instead of containing appropriate

5  cautionary language, furthers the lie by promising the 8.25% as a "pure gross return."  This is

6  what that ad looks like:



88.    This is a false advertisement.  In reality, none of the funds controlled by

Defendants are able to generate a guaranteed 8.25% return or any guaranteed return, and the Fund

has fallen short of that mark on multiple occasions.

89.    This misleading advertisement is not an outlier – rather, it is one of countless

instances in which Defendants repeat this same false promise.  For example, on Noble Capital's

Yelp page, a quote attributed to Defendant Ragland states, without disclaimer, that "Noble

Capital's members earn 8-10% interest on their money, short term, backed by real estate." *See*

https://www.yelp.com/biz/noble-capital-austin-2 (last accessed May 6, 2019 at 10:41 p.m.). This is

what that looks like:

1

**Meet the Manager**

 **Chris R.**
Manager

2

3    Chris Ragland is currently the Chief Operating Officer of Noble Capital.

4    The mission of Noble Capital is to be Texas' premiere Private Real Estate Lending Platform,
5    providing quality lending opportunities to members of our Private Lender Network.

6    Noble Capital's members earn 8-10% interest on their money, short term, backed by real
     estate.

7

8

9        90.    Similarly, Noble Capital's website and its YouTube channel prominently feature a

10   misleading one-minute introductory video wherein Noble Capital states: "HOW WOULD YOU

11   LIKE TO EARN 8-10% INTEREST ON YOUR MONEY?"  That assertion is not, at any point,

12   accompanied by cautionary language.  Here is a still frame taken from

13   https://www.youtube.com/watch?v= nkAXXADQaYg on Monday May 6, 2019 at 10:19 p.m.:

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

91.     These are but a few of the countless instances in which Defendants have falsely promised investors an 8% or above guaranteed, no-risk return.

92.     Defendants further mislead investors by suggesting that investments that are made in any of its funds, including the Fund, are risk free.  For example, Defendant Ragland stated the following to investors at Noble's Q1 2019 state of the company event, which was held in a large, theater-sized room in Austin, Texas, and published on youtube.com and facebook.com on or around April 29, 2019:

> "I want to get into the real estate performance.  So real estate and foreclosure specific details . . .  ***more than half the people in this room are inside of funds, so regardless of how good of a job we do, you're still getting your payments on your properties,*** but you still want to know that the underlying assets are healthy, so that's why we're going through the details today."

Available at https://www.youtube.com/watch?v=56Zak45tcyk at 31:10 (accessed on May 6 at 10:48 p.m.).

93.     This too is false.  In truth, an investment in the Fund or in any of the Noble Capital's other funds does carry risk.  Hard-money construction loans, with their attendant 12%-14% interest rates, carry more risk than a standard-rate mortgage.  That means that the Fund's investments—loans to borrowers who cannot obtain a better interest rate through traditional means—do carry risk.

94.     These material misrepresentations are relied upon by investors in the Fund, exposing the Fund to consumer dissatisfaction, requests for refunds and disgorgement, competitive injury, and potentially other civil and regulatory liabilities.

95.     These material misrepresentations have also enabled Defendants to divert investors from the Fund into Noble Capital's wholly-owned funds.

### 2.     Having Set False Expectations, Defendants Mislead Investors About the Substantial Losses Incurred on Their Behalf

96.     Defendants also have attempted to induce the Fund to use improper accounting to mask losses.  For example, in Q1 2018, Defendant Collins requested that additional amounts from the Fund's reserve be distributed to investors to cover performance shortfalls (*i.e.*, performance below the 8.25% that Defendants misleadingly promised).  The Fund did not agree to use Fund

reserves in the manner suggested, which would amount to improper accounting, but did agree to a one-time "excess" payment to investors under the theory that this money would be recouped from excess profit in Q2.

97.     In Q2 2018, however, Defendant Collins instructed the Fund **not to** deduct the Q1 excess payment from Q2 returns.  In response, the Fund reminded Noble that because "Grady [Collins] had requested additional payments to be made last quarter," those amounts needed to be deduced from Q2 net income.  This was consistent with the analysis the Fund's CPA had conducted and which the Fund had shared with Defendant Collins.

98.     Nevertheless, Defendant Collins suggested that the Fund should "manage" returns by taking these amounts "out of the loan loss reserves not out of future income from the next quarter."  At this point US Capital's managing partner, Charles Towle, had to remind Collins: "We cannot use loan loss reserves for this.  This is an account that is audited with strict standards."

99.     In Q3 2018, Defendants doubled down on their scheme to cover up poor performance after the Fund again projected a return to investors that was less than 8.25%.  Defendant Collins stated:  "We can't keep publishing the financial stating we hit the hurdle rate of 8.25% and the investors get less than that.   We can explain it to them all we want but they don't really care ***and feel like they have been misled*** and will look to start withdrawing when their lockup expires.  Not good.  ***Waiving some fees (not ours) to get the necessary cash for the full distribution may be a good idea***."  (Emphasis added).

100.     Two days later, Defendant Ragland ratcheted up the pressure on the Fund to cover up Noble's misrepresentations, stating:  "I wanted you to know that we are getting our first calls from lenders asking how they can get out of the fund.  Two main drivers:  1) ***We missed the return again***.  The current investors via Feeder Funds are paid on cash, as opposed to invested capital. . . . As a result[,] the Feeder Funds are paying 7.90% or 7.74% depending on which one you are in. . . . Not asking for a response, just giving you feedback.  ***I hope we can get to resolution quickly***."  (Emphasis added).  Ragland's proposed resolution, as described above, was

1    for either the Fund or US Capital to cover the delta between the Fund's actual returns and Noble's

2    fraudulently promised returns.  The Fund refused to do so.

3        101.    When the Fund refused to accede to Defendants' improper attempts to conceal their

4    poor performance, Noble simply informed investors that it was the Fund's agent, US Capital, and

5    not Noble, that was to blame.

6    **B.    Defendants Use the Fund's CUSIP, Goodwill, Name, and Reputation to
         Mislead Investors**

7

8        102.    The Fund, through the efforts of US Capital, applied for and obtained a CUSIP

9    number—a unique, nine-digit alphanumeric code that identifies it as a financial security under the

10   standards of the Committee on Uniform Security Identification Procedures—for use in listing and

11   advertising the Fund's offering.

12       103.    Defendants trade on the CUSIP number of the Fund, and by extension, its

13   reputation and name, by using it in advertisements for Noble entities without permission or

14   attribution.

15       104.    This misleads investors into believing that the Noble entities have achieved

16   financial safety and soundness benchmarks that have been verified by third-party monitoring

17   entities, when in fact only the Fund has those credentials.

18       105.    For example, on March 27, 2018, Noble Capital published a fraudulent press

19   release, attached here as **Exhibit B**, with the headline "Noble Capital Issued CUSIP Securities

20   Identification."

21       106.    In that same release, Defendant Newman misled investors by asserting:  "Obtaining

22   ***our CUSIP*** is the culmination of many months of effort . . . ***We worked closely with Fidelity who***

23   ***conducted a great deal of diligence on Noble Capital*** and the Fund throughout this process."

24   (Emphasis added.)

25       107.    Similarly, Defendant Ragland stated:  "We're excited to bring this opportunity to a

26   larger pool of advisers and potential investors through a highly reputable platform."

27

28

108.     Noble Capital further stated: "The CUSIP, or Committee on Uniform Security Identification Procedures . . . represents accurate and efficient clearance and settlement of securities."

109.     This press release was not an outlier.  In Noble Capital's Q1 2018 "State of the Company" report, which was published on Noble Capital's website on or around April 24, 2018, Noble Capital misleadingly stated:  "After many months of work and third-party due diligence, we were issued a CUSIP securities identification for our Signature Fund."

110.     Likewise, in Noble Capital's Q2 2018 "State of the Company" report, which was published on Noble Capital's website on June 27, 2018, Noble Capital misleadingly referred to "[t]he issuance of Noble Capital's CUSIP identification and subsequent Fidelity listing last quarter . . . ."

111.     All of these references to Noble's CUSIP are misleading because Noble Capital does not have a CUSIP.  Only the Fund has a CUSIP.

112.     Having lured investors through Noble's door by freeriding on the credentials of the Fund, Defendants wrongfully divert them into other Noble funds and investment vehicles by (1) portraying the losses that the Fund was unwilling to cover as the Fund's fault rather than Noble's, and (2) saddling the Fund with the lowest performing loans of any of the funds that Noble manages.

113.     For example, in Noble Capital's Q1 2019 "State of the Company" presentation, Defendant Collins showed slides comparing the Fund's non-performing notes unfavorably to two Noble-controlled funds, "Income Fund II" and "Income Fund III."  After describing the Fund's non-performance rate of 7.5%, Collins showed Income Fund II's performance slide, which looks like this:



Collins stated:  "Performance, this is the one I want to highlight.  I don't think there's a ranking for private lending debt funds, but if there were as far as performance goes, we're tied for #1 in the world.  Can anybody else say that they're in a real estate debt fund that's the #1 performing debt fund in the world.  I'm gonna say it again because I may [sic] be able to say it again next quarter.  Right now we're tied #1 in the world in performance.  We've talked a lot about that earlier, superior performance, [Defendant Navarro] talked about it in underwriting, that's definitely a reflection here in our fund with [sic] you can't get much superior [sic] than that."

114.    For Income Fund III, Defendant Collins displayed a slide showing 95% performing notes, and stated:  "Can't quite say we're tied for #1, but we're up there pretty high."

115.    This comparison, in conjunction with Defendant's messaging to individual investors about the Fund's management, was designed to mislead investors and divert them from the Fund into Income Funds II and III and other Noble-controlled funds.  This is misleading for the additional reason that Noble Capital made all of the loan funding decisions for all three funds.

**C.    Defendants Lie to Investors About Past Bankruptcies and Leverage**

116.    Noble Capital, and Defendant Newman in particular, concocted a false historical narrative about Noble Capital to portray it as a sound investment.  In explaining the past struggles of Noble Capital during the financial crisis of 2008-2010, Newman tells investors, "you can't trust

Case 3:19-cv-02750-JSC   Document 1   Filed 05/20/19   Page 28 of 57

a man without a limp." But the story behind Noble's so called "limp" is based on a series of misrepresentations and omissions.

117.    Among other things, in a September 1, 2018 Originate report that was published online, attached here as **Exhibit C**, Defendant Newman claimed that "[a]gainst the advice of attorneys and counselors, the company did not file bankruptcy," during the financial crisis.

118.    This is a lie. In reality, Newman was the authorized signatory on a Chapter 11 bankruptcy petition for Noble Capital Fund Management (sometimes "NCFM" or "NCFM, LLC"), filed on June 1, 2010.

119.    Newman filed an amended bankruptcy petition for Noble Capital Fund Management on June 25, 2010. The amended petition notes several other corporate names used by Noble Capital Fund Management, whose NCFM-assumed debts were therefore also being discharged, including Noble Capital Fund III, LP, Noble Capital First Mark, LLC, and SSG Partner Holdings, LP.

120.    Among the $6,716,765.51 in liabilities that Newman sought to discharge was a $69,200.44 debt owed to Noble Capital Servicing.

121.    Newman also signed a Chapter 11 bankruptcy petition for the Noble entity Noble Capital REO, LLC on November 03, 2008.

122.    Newman also signed the Chapter 11 bankruptcy petition for the Noble-related entity Cypress Creek Village LP, on October 5, 2009. The petition sought to resolve $3,552,185.87 in liabilities, including liabilities owed to three separate Noble-related entities. The largest of these amounted to $299,600.00 and was owed to the investor entity Noble Capital Fund II, LP.

123.    Newman also signed the Chapter 11 bankruptcy petition for the Noble entity NC Firstmark, LLC, on June 1, 2010, with Noble Capital Fund Management, LLC listed as the primary creditor.

124.    In addition to the false narrative about its bankruptcies, Noble Capital also misrepresents its leverage to investors to cause them to believe that investments in Noble entities are safer than they in fact are, thus gaining an unfair competitive edge.

25
COMPLAINT

125.    For example, in the Originate report discussed above, **Ex. C**, Defendant Newman stated:  "We are 100% unleveraged today which is going to come across as very surprising to readers of this article . . . . We built our $150 million portfolio unleveraged.  That's one of the remarkable things we've been able to do."

126.    This is not just "surprising," it is false.  For one, on information and belief, Noble has almost no equity of its own—its investment activities are based almost entirely on third-party funding.  Furthermore, Noble, through its entity Noble Capital Properties, stepped into the shoes of numerous borrowers who defaulted on loans that were obtained from the Fund.  As a result, Noble Capital Properties is not only leveraged, it is the single largest borrower of Fund assets.

127.    Even disinterested third parties have concluded that Noble Capital is overleveraged, and not unleveraged, as Noble claims.  In 2018, the Fund sought to obtain leverage from Legacy Texas Bank ("Bank"), and successfully cleared numerous hurdles in that process.  But when it came time for the Bank to diligence Noble Capital, the Bank concluded that Noble was saddled with so many excess liabilities that it presented an unacceptable risk.  Accordingly, the Bank denied the Fund the leverage it sought.

128.    Defendant Navarro is listed as the point of contact for investors who have questions about the false statements quoted above.

**D.    Defendants Issue Improper Schedule K-1s to Investors**

129.    An additional aspect of Defendant's false advertising scheme is the advertisement and issuance of improper Schedule K-1 tax documents to investors.

130.    Schedule K-1s differentiate interest income, which is taxed at an unfavorable rate, from enterprise associated income, which receives a more favorable tax treatment.

131.    The income investors earn from the Fund and from Noble Capital's other funds is interest income—*i.e.*, interest derived from short-term high-yield real-estate loans, as Defendant Ragland has described it.

132.    Nevertheless, the Individual Defendants, and Defendant Collins in particular, caused the Noble entities and the CPAs they control to issue false K-1s that showed this investment income as enterprise associated income.

133.     The Fund notified Defendant Collins that this was improper on March 29, 2019, but Collins persisted, and Noble Capital issued numerous improper K-1s.

134.     To this day, Defendants actively advertise their improper K-1 policy on the Noble Advisor Edge website, noblecapital.com/investor-relations/advisor-edge:



135.     Noble Capital's inaccurate claims of favorable tax treatment (and associated issuance of improper K-1s) constitute false advertising and have caused competitive economic and reputational harms to the Fund.

## VI.     Defendants Convert the Fund's Assets, Causing Millions in Further Losses

136.     As a result of the bad loans that Defendants originated, and as a part of their overarching plan to plunder Fund assets, Defendants, acting through Noble Capital Properties, executed a series of interrelated Memoranda of Understanding with the Fund.

137.     Pursuant to a Memorandum of Understanding dated May 4, 2018 and signed by Defendant Ragland, Noble Capital Properties "assume[d] the role of Borrower" and took responsibility for covering the interest payable and principal for four foreclosed properties: (1) Bullet Cove 21400; (2) Dakar Road W. 1724; (3) W 29th 1406; (4) Northwood 6004.

138.     Pursuant to a Memorandum of Understanding dated June 30, 2018 (the "MOU") and signed by Defendant Collins, Noble Capital Properties agreed to purchase six notes for a total

of $2,389,125.91 and corresponding to the four properties listed above, as well as (5) Wigton 5026 and (6) Galesburg (collectively the "MOU properties").

139.    Noble Capital Properties and "all related entities" also promised to "issue a cross corporate guarantee and security agreement in favor of the Fund," and further agreed to provide new notes along with the security agreement by September 1, 2018.

140.    Despite these promises, Defendants never intended to and never have issued the corporate guarantee and security agreement in favor of the Fund.

141.    Likewise, Defendants never intended to and never have issued the new notes that were promised for the aforementioned properties, even though the Fund and its auditor have recently and repeatedly requested them.

142.    On information and belief, Defendants wrongfully transferred three of the MOU properties—Northwood 6004, W 29th 1406, and Wigton 5026 (collectively the "three converted properties")—and potentially others, to a different Noble entity that has not yet been determined, which may or may not be in privity of contract with the Fund, for their own personal gain.

143.    On information and belief, the transfer of the three converted properties was not made in exchange for any consideration, let alone reasonably equivalent value.

144.    As a result of Noble Capital Properties' actions, the Fund has lost valuable assets and may be forced to restate its 2018 financials to account for that loss which, based on the combined purchase price that Noble Capital Properties agreed to pay for the three converted properties, is at least $1,761,176.66.

145.    Noble Capital Properties is also delinquent on $ 41,337.29 interest owed pursuant to the MOUs.

146.    In addition to converting three of the six MOU properties, Defendants have also caused the conversion of a fourth property, "Herbert 6604," which Noble foreclosed on and transferred to Noble Capital Properties.  No note or security guarantee has issued for that property either.  In fact, a Noble employee informed the Fund that, with respect to the Herbert property, "[t]here will be no unsecured new note created."  Given Noble's refusal to issue a note, which has

1    no justification, the Fund may be forced to account for that property as a total loss.  The principal

2    balance on Herbert 6604 is $102,600.00.

3        147.   Recently a fifth property denoted "Sherwood 2600" was foreclosed by Noble and

4    transferred to another separate Noble entity Streamline Funding Group, LLC. The principal

5    balance on Sherwood 2600 is $780,000.00.  No note or security guarantee has issued for that

6    property either.

7        148.   Two additional Fund properties are at high risk of conversion, putting the Fund at

8    risk of another $376,600.00 in losses:  (1) a property denoted "Mobile 1015" is 97 days in arrears

9    and has a principal balance of $356,600.00; and (2) a property denoted "Cedar 419" is 335 days in

10   arrears and has a principal balance of $20,000.  As was the case with Herbert 6604 and Sherwood

11   2600, Noble has refused to issue a new note for Cedar 419, even though it has indicated it is

12   pursuing collection and foreclosure proceedings.

**COUNT ONE**

**Civil Violations of the Racketeer Influenced and Corrupt Organizations Act**

**(18 U.S.C. § 1962(c))**

**(Against All Defendants)**

18       149.   Plaintiff hereby incorporates the allegations of paragraphs 1 through 148 of this

19   Complaint as though fully set forth herein and alleges the following cause of action.

20       150.   Each Defendant is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and

21   l964(c).

22       151.   Defendants Newman, Ragland, Navarro, and Collins, consisting of individuals,

23   formed an association-in-fact, whose joint and common purpose was to generate profits by

24   defrauding the Fund out of Fund assets.  All Individual Defendants received misappropriated Fund

25   funds at various points throughout the period from January 2017 to the present, including but not

26   limited to those referenced in paragraphs 35, 50, 61, 63-65, 74, and 75.

27       152.   The Individual Defendants exercised control over the enterprise Noble Capital and

28   the numerous related entities that this enterprise consists of.  Plaintiff is informed and believes that

all Individual Defendants ultimately controlled and managed the operations of the entire association-in-fact and often personally directed the day-to-day operations of the multiple business entities referenced above.

153.    This association-in-fact is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  The enterprise was at all times engaged in interstate commerce and its activities affected and continue to affect interstate commerce.  The interstate nexus includes but is not limited to the transfer of funds to multiple persons and entities in Texas, California, and elsewhere.

154.    The Individual Defendants and DOES 1-50 were each associated with the association-in-fact enterprise and conducted or participated, directly or indirectly, in the conduct of the affairs of this enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(l)(B), 1961(5) and 1962(c).

155.    The Individual Defendants formed a scheme to defraud the Fund of its assets whereby they induced the Fund to fund loans managed by the Individual Defendants that posed an unacceptably high risk of default for personal gain and to conceal enterprise losses from other related entities.  The Individual Defendants knew that the borrowers for these loans had gone through recent foreclosures or were already in default, but they assured the Fund that these were recommend borrowers with clean background reports that had been properly reviewed.  The Individual Defendants then engaged in numerous acts designed to conceal or prolong their fraud, including entering into the MOUs, and converting the Fund's tangible and intangible assets for their own benefit without the Fund's consent.

156.    In furtherance of this scheme, the Individual Defendants used or caused to be used interstate wire communications in violation of 18 U.S.C. § 1343.  The Individual Defendants initiated and received multiple transfers of Fund and loan borrower funds across state lines via the use of wires including but not limited to the transfers referenced in paragraphs 35, 50, 61, 74, and 75.  The Individual Defendants and others also communicated materially false statements and deceitfully omitted material facts to the Fund via the use of wires including but not limited to the communications and omissions referenced in paragraphs 63-67.  Each of these wire

1   communications, omissions, and transfers of Fund assets to other entities rather than for the

2   benefit of the Fund satisfies the transmission "by means of wire, radio, or television

3   communication" element for wire fraud.

4          157.    In furtherance of this scheme to defraud, the Individual Defendants used or caused

5   to be used the United States mails or an interstate commercial carrier in violation of 18 U.S.C. §

6   1341.  The Individual Defendants initiated and received multiple transfers of Fund funds across

7   state lines via the use of the mails, including but not limited to the transfers referenced in

8   paragraphs 35, 50, 61, 74, and 75.  Each of these transfers of Fund assets to out-of-state entities

9   rather than for the benefit of the Company satisfies the "use of the mail" element for mail fraud.

10          158.    In furtherance of this scheme to defraud the Fund of its money or property having a

11   value of $5,000 or more, the Individual Defendants initiated and received multiple transfers that

12   caused Fund funds to travel or be transported in interstate commerce in violation of 18 U.S.C §§

13   2314 and 2315, including but not limited to the transfers referenced in paragraphs 35, 50, 61, 74,

14   and 75.

15          159.    By reason of the Individual Defendants' violation of 18 U.S.C. § 1962(c), the Fund

16   suffered injury in an amount to be determined at trial.

17          160.    Pursuant to 18 U.S.C. § 1964(c), the Fund is entitled to treble damages.

18          161.    In bringing this action, the Fund has and will incur attorneys' fees and is entitled to

19   an award of reasonable attorneys' fees under 18 U.S.C. § 1964(c).

20          162.    The Fund additionally seeks the return/restitution of any assets from Noble Capital

21   entities or subsidiary corporations or other alter ego entities controlled by the Individual

22   Defendants that received misappropriated Fund funds, including those that were dissolved and had

23   their assets disbursed to the Individual Defendants and/or the corporations they control.

24   / /

25   / /

26   / /

27   / /

28   / /

## COUNT TWO

**Civil Violations of the Racketeer Influenced and Corrupt Organizations Act**

**(18 U.S.C. § 1962(d))**

**(Against All Defendants)**

163.    Plaintiff hereby incorporates the allegations of paragraphs 1 through 162 of this Complaint as though fully set forth herein and alleges the following cause of action.

164.    The Individual Defendants each conspired with one another within the meaning of 18 U.S.C. § 1962(d) to violate § 1962(c); that is, to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961 (1)(B) and 1961(5) and 1962(c), as identified more fully in paragraphs 151 to 158 above.

165.    By reason of the violation of 18 U.S.C. § 1962(d) committed by the Individual Defendants, the Fund suffered injury in an amount to be proven at trial, within the meaning of 18 U.S.C. § 1962(c).

166.    Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to treble damages.

167.    In bringing this action, Plaintiff has and will incur attorneys' fees and is entitled to an award of reasonable attorneys' fees under 18 U.S.C. § 1964(c).

## COUNT THREE

**Fraud**

**(Against the Individual Defendants and Noble Capital Fund Management)**

168.    Plaintiff hereby incorporates the allegations of paragraphs 1 through 167 of this Complaint as though fully set forth herein.

169.    As detailed above, the Individual Defendants and Noble Capital Fund Management made repeated false and fraudulent misrepresentations and omissions to Plaintiff regarding: (1) their investigation of the "credentials" of borrowers and of borrowers' histories of foreclosures and defaults; (2) the recommendation to fund a loan to FDI Divine Property Group; (3) the representation that all background reports for the FDI loan "came back clean";  (4) the

1   recommendation to fund a loan to Northshore Homes; (5) the representation that all background

2   reports for the Northshore Home loan "came back clean"; (6) the recommendation to fund a loan

3   to Loved Homes of Austin; (7) the representation that all background reports for the Loved Homes

4   loan "came back clean".

5         170.    These representations were false.  In fact: (1) Defendants had not properly looked

6   into or reported on borrower credentials; (2) FDI was not an appropriate borrower to recommend

7   because FDI's owner had a long history of foreclosure, including one three months before Noble

8   Capital issued this loan; (3) Defendants had months of experience with the FDI borrowers and

9   knew they were likely to default; (4) Northshore Homes was not an appropriate borrower to

10   recommend because it had as many as seventeen prior foreclosures and eighteen judgments on its

11   record; (5) Defendants had months of experience with the Northshore Homes borrowers and knew

12   they were likely to default; (6) Loved Homes was not an appropriate borrower to recommend

13   because Noble Capital had already caused a notice of default to be issued against that entity, and it

14   knew that Loved Homes was likely to default.

15         171.    The false statements were made by Noble Capital Fund Management in documents

16   signed by Defendants Ragland and Collins, based on loans that were vetted by Defendant Navarro

17   and the overarching scheme devised by all four Individual Defendants.

18         172.    When Defendants made these representations and omissions, they knew that they

19   were false.  These representations and omissions were made with the intent to defraud and

20   deceive.  Moreover, at the time Defendants made these promises to the Fund, Defendants

21   understood that the loans were likely to default.

22         173.    At the time Defendants made these representations and omissions, Plaintiff was

23   unaware of their falsity and believed them to be true.  Plaintiff relied upon these

24   misrepresentations and omissions and would not have agreed to fund the proposed loans if it had

25   known the truth.

26         174.    Plaintiff's reliance on Defendants' misrepresentations and omissions was

27   justifiable.

28

175.    As a result of Defendants fraudulent misrepresentations and omissions, Plaintiff has been damaged in an amount to be proven at trial.

176.    In doing the acts alleged herein, Defendants acted with oppression, fraud, and malice, and Plaintiff is entitled to punitive damages.

**COUNT FOUR**

**False Advertising**

**(15 U.S.C. § 1125)**

**(Against the Individual Defendants, Noble Capital Group, Noble Capital Fund Management Income Fund II, and Income Fund III)**

177.    The Fund hereby incorporates the allegations of paragraphs 1 through 176 of this Complaint as though fully set forth herein and alleges the following cause of action.

178.    Defendants have used false and misleading statements of fact in their commercial advertisements and promotions, both on behalf of the Fund and also in order to divert investment money away from the Fund and into Defendants' other funds, including Income Fund II and Income Fund III.

179.    Defendants false and misleading statements are attributed either to the individual Defendants directly, as described in the substantive allegations above, or more generally to Noble Capital or Noble without specific attribution.  Noble Capital Group and Noble Capital Fund Management are the primary entities who use those statements to funnel investors into Noble-controlled funds like Income Fund II and Income Fund III.

180.    Specifically, Defendants have used the names "US Capital / Noble Capital Texas Real Estate Income Fund, LP," "Signature Fund" and/or "Fund" in order to attract investors to the Fund, but Defendants then divert the investors' money to their other funds.  Defendants have likewise used the Fund's Private Placement Memorandum and unique CUSIP number in misleading advertisements and promotions, in order to attract investors to the Fund and divert investment money into Defendants' other funds.

181.   The name "Signature Fund" was never approved by the Fund to advertise the Fund. Defendants' purpose for advertising the Fund under the name "Signature Fund" is to confuse investors as to the identity and/or attributes of the Fund, for their own profit.

182.   Defendants have also made false or misleading statements of fact regarding the nature, characteristics and qualities of the Fund in their advertisements and promotions, misrepresenting the amount of the Fund's annual return and giving the misleading impression that the Fund's returns are guaranteed and without risk.

183.   Defendants' false designations of origin and false and misleading statements are likely to cause confusion, mistake or deception among members of the public, and have deceived investors in the Fund and in Defendants' other funds in material ways.

184.   Defendants make their false and misleading statements in various press releases, online interviews, websites, YouTube and other online videos, blogs, podcasts and an online radio show, all of which are in interstate commerce.

185.   Defendants' false and misleading statements have caused or are likely to cause competitive or commercial injury to the Fund, in that the Fund has lost investment money that Defendants diverted to their other funds, and the Fund's reputation has been harmed by Defendants' false and fraudulent promises of guaranteed returns without risk.

## COUNT FIVE

### Unfair Competition

### (Cal. Bus. & Prof. Code §§ 17200 *et seq.* and 17500 *et seq.*)

### (Against the Individual Defendants, Noble Capital Group, Noble Capital Fund Management Income Fund II, and Income Fund III)

186.   The Fund hereby incorporates the allegations of paragraphs 1 through 185 of this Complaint as though fully set forth herein and alleges the following cause of action.

187.   Defendants have engaged in unlawful, unfair or fraudulent business acts or practices within the meaning of California Business and Professions Code § 17200, *et seq.*, and have engaged in unfair, deceptive, untrue or misleading advertising and other acts prohibited by California Business and Professions Code §§ 17500-17577.5.

188.    Defendants have used false and misleading statements of fact in their commercial advertisements and promotions, both on behalf of the Fund and also in order to divert investment money away from the Fund and into Defendants' other funds.  Defendants' false and misleading statements are attributed either to the individual Defendants directly, as described in the substantive allegations, or more generally to Noble Capital or Noble, without specific attribution to a particular Noble Capital entity.

189.    Specifically, Defendants have used the names "US Capital / Noble Capital Texas Real Estate Income Fund, LP," "Signature Fund" and/or "Fund" in order to attract investors to the Fund, but Defendants then divert the investors' money to their other funds.  Defendants have likewise used the Fund's unique CUSIP number in misleading advertisements and promotions to attract investors to the Fund and divert investment money into Defendants' other funds.

190.    Defendants have also made false or misleading statements of fact regarding the nature, characteristics and qualities of the Fund in their advertisements and promotions, misrepresenting the amount of the Fund's annual return and giving the misleading impression that the Fund's returns are guaranteed and without risk.

191.    Defendants' false designations of origin false and misleading statements are likely to cause confusion, mistake or deception among members of the public, and have deceived investors in the Fund and in Defendants' other funds in material ways.

192.    Defendants' false and misleading statements have caused or are likely to cause substantial harm to the Fund, in that the Fund has lost investment money that Defendants diverted to their other funds, and the Fund's reputation has been harmed by Defendants' false and fraudulent promises of guaranteed returns without risk.

## COUNT SIX

### Breach of Contract – The MASA

### (Against Noble Capital Fund Management)

193.    The Fund hereby incorporates the allegations of paragraphs 1 through 192 of this Complaint as though fully set forth herein and alleges the following cause of action.

194.    On January 18, 2017, the Fund and various Noble Capital entities acting at the direction of the Individual Defendants and through the signatory Noble Capital Fund Management executed the MASA, which was signed on behalf of the Noble Capital entities by Defendant Collins, and on behalf of the Fund by the CEO of US Capital, Jeffrey Sweeney.

195.    At all relevant times, the Fund has performed its obligations under the MASA.

196.    The MASA requires Noble Capital Fund Management to "[c]onduct due diligence on prospective borrowers and investment opportunities in compliance with the credit criteria and underwriting guidelines specified in the Private Placement Memorandum."

197.    Noble Capital Fund Management breached this provision of the MASA by its failure to properly diligence borrowers.  As a result of this failure, these defendants caused the Fund to lend to a number of high-risk borrowers, many of whom defaulted on their loans almost immediately after being granted them.  This damaged the Fund.

198.    The MASA further requires Noble Capital to "[s]tructure, securitize, document, and execute transactions based on due diligence findings," to generate profits for the Fund.  Noble Capital Fund Management breached this provision of the MASA by executing transactions that were not based on appropriate diligence findings, and that posed an unacceptable risk of default.  These transactions were executed so that Defendants could profit from loan origination and servicing fees, and not for the purpose of generating profits for the Fund.

199.    The MASA also required Noble Capital Fund Management to "[r]epossess, restructure, or otherwise remedy properties or borrowers in events of default to preserve principal."  Noble Capital Fund Management breached this provision of the MASA by failing to properly remedy defaults pursuant to the terms of the MOU executed between Noble Capital Properties and the Fund.  Specifically, Noble Capital Fund Management failed to cause an appropriate Noble Capital entity to issue the required notes, security and cross corporate guarantees, and interest payments called for in the MOUs.

200.    As a result of Noble Capital Fund Management's breach, the Fund has been damaged due to loss of assets and property in an amount which will be proven at trial.

1

2

3

4

**COUNT SEVEN**

**Breach of Contract – The MOU**

**(Against Noble Capital Properties)**

5   201.    The Fund hereby incorporates the allegations of paragraphs 1 through 200 of this

6   Complaint as though fully set forth herein and alleges the following cause of action.

7   202.    The Fund and various Noble Capital entities acting at the direction of the Individual

8   Defendants and through the signatory Noble Capital Properties, executed a MOU with the Fund on

9   June 30, 2018.  The MOU was signed by Jeffrey Sweeney on behalf of the Fund and Defendant

10  Collins on behalf of Noble Capital Properties.

11  203.    At all relevant times, the Fund has performed all of its obligations under the

12  MOUs.

13  204.    Pursuant to the June 30, 2018 MOU, Noble Capital Properties promised that it

14  would finalize and issue new notes for the MOU properties by September 1, 2018.  Noble Capital

15  Properties breached this provision of the MOU by failing to issue new notes for any of the MOU

16  properties at any time, despite the Fund's repeated requests.

17  205.    The June 30, 2018 MOU further required Noble Capital Properties to issue a cross

18  corporate guarantee and security agreement in favor of the Fund by September 1, 2018.  Noble

19  Capital Properties breached this provision of the MOU by failing to do so at any time.

20  206.    Noble Capital Properties has further breached the June 30, 2018 MOU by failing to

21  pay $ 41,337.29 in interest that is called for pursuant to the contract, and is past due.

22  207.    As a result of Noble Capital Properties's breach, the Fund has been damaged due to

23  loss of assets and property in an amount which will be proven at trial.

24  / /

25  / /

26  / /

27  / /

28  / /

1
2
3
4

**COUNT EIGHT**

**Conversion**

**(Against Noble Capital Properties)**

5      208.    The Fund hereby incorporates the allegations of paragraphs 1 through 207 of this

6    Complaint as though fully set forth herein and alleges the following cause of action.

7      209.    Noble Capital Properties substantially interfered with the Fund's property interest

8    in Northwood 6004, W 29th 1406, and Wigton 5026 by failing to issue new notes or a cross

9    corporate guarantee for those properties, and by transferring them to another Noble entity without

10   the Fund's consent, for their own use and benefit.

11     210.    Noble Capital Properties also substantially interfered with the Fund's property

12   interest in Sherwood 2600 and Herbert 6604 by foreclosing on those properties and transferring

13   them to a Noble entity for their own use and benefit without the Fund's consent.

14     211.    As a direct and proximate result of Noble Capital Properties's conversion of the

15   Fund's assets, the Fund has incurred damages in an amount to be proven at trial.

16     212.    In engaging in the foregoing conduct, Noble Capital Properties acted with malice,

17   oppression and fraud, warranting an award of punitive damages in an amount to be proven at trial.

18     213.    By reason of the unlawful conversion of the Fund's property by Noble Capital

19   Properties, the Fund is entitled to recover the value of the property at the time of the conversion,

20   with interest, and a fair compensation for the time and  money properly expended to recover the

21   property pursuant to California Civil Code § 3336, in an amount to be proven at trial.

22     214.    The Fund additionally seeks the return/restitution of any assets from alter ego

23   corporations that received converted Fund assets, including those that were dissolved and had their

24   assets disbursed to Defendants and/or other corporations they control.

25   / /

26   / /

27   / /

28   / /

**COUNT NINE**

**Unjust Enrichment**

**(Against All Defendants)**

215.    The Fund hereby incorporates the allegations of paragraphs 1 through 213 of this Complaint as though fully set forth herein and alleges the following cause of action.

216.    As a result of their wrongful conduct, Defendants have been unjustly enriched at the expense of the Fund and its investors, in the form of unjustified benefits, payments, and transfers of Fund assets including, but not limited to:

      (a)      freeriding on the Fund's name, CUSIP, goodwill, and reputation;

      (b)      profit derived from the improper diversion of Fund investors into Noble-controlled investment vehicles;

      (c)      converting Fund property interests relating to Northwood 6004, W 29th 1406, Wigton 5026, Sherwood 2600, and Herbert 6604 to their own benefit;

      (d)      offloading bad loans onto the Fund and thereby minimizing their own losses; and

      (e)      collecting origination, servicing, REO, workout fees, tax benefits, and other benefits from originating bad loans.

217.    As a result of these unjustified payments and transfers of Fund assets, Defendants are thereby required to make restitution.

218.    Accordingly, the Fund is entitled to disgorgement by Defendants of all monies assets and benefits obtained directly or indirectly through their wrongful conduct as alleged herein.

**PRAYER FOR RELIEF**

219.    WHEREFORE, Plaintiff requests judgment as follows:

      a.    That Defendants, and all other persons acting in active concert or privately or in participation with Defendants, be temporarily, preliminarily, and permanently enjoined from the wrongful acts and conduct set forth above;

1      b.  That Plaintiff receive such other injunctive relief as it may request and the

2           Court may deem just and proper;

3      c.  That Defendants be required to account for all gains, profits, and advantages

4           derived from their acts of conversion and other violations of law;

5      d.  That all gains, profits and advantages derived by Defendants from acts of

6           conversion and other violations of law be deemed to be in constructive trust for

7           the benefit of Plaintiff;

8      e.  For an order requiring Defendants to disgorge profits earned from their

9           unlawful conduct;

10     f.  For an award of restitution, unjust enrichment, actual damages, statutory

11         damages, and compensatory damages according to proof at trial;

12     g.  For punitive and exemplary damages according to proof at trial;

13     h.  Pursuant to California Business & Professions Code § 17203 and the equitable

14         powers of this Court, that Defendants be ordered to restore to Plaintiff all funds

15         acquired by means of any act or practice declared by this Court to be unlawful

16         or fraudulent or to constitute unfair competition under Business & Professions

17         Code §§ 17200 *et seq*.;

18     i.  For a finding that all of the Noble Capital entities are alter egos of Defendants

19         Newman, Ragland, Navarro, and Collins;

20     j.  That this Court order that, as the alter ego of the Noble Capital entities,

21         Newman, Ragland, Navarro, and Collins are individually liable for Defendants'

22         failure to fulfill their statutory, contractual, and common law obligations to the

23         Fund, as set forth herein;

24     k.  That, pursuant to this Court's equity powers, a constructive trust be imposed in

25         favor of the Fund over all assets controlled by Defendants Newman, Ragland,

26         Navarro, Collins, and Noble Capital, to avoid the unjust enrichment that would

27         occur if these Defendants were able to avoid paying any monetary award

28

1    granted to the Fund by moving monies owed to the Fund among the many

2    entities that the Individual Defendants control;

3    l.   For all statutory damages and penalties;

4    m.   For the return/restitution of any assets from Noble Capital entities that received

5    misappropriated Fund funds, including those that were dissolved and had their

6    assets disbursed to other Noble Capital entities or to the Individual Defendants;

7    n.   For attorneys' fees, costs of suit, and prejudgment and post judgment interest,

8    as provided under applicable law; and

9    o.   For such other and further relief as the Court deems just and proper.

10   **<u>DEMAND FOR JURY TRIAL</u>**

11   The Fund demands trial by jury on all claims and issues so triable.

12

13

14   Dated:  May 20, 2019                    ALTO LITIGATION, PC

15

16                                           By: *<u>/s/ Bahram Seyedin-Noor</u>*

17                                           Bahram Seyedin-Noor

18                                           Attorneys for Plaintiff,
                                             US Capital/Noble Capital Texas Real Estate
19                                           Income Fund, LP

20

21

22

23

24

25

26

27

28

42
COMPLAINT

EXHIBIT A



ADVISOREDGE

# SIGNATURE | FUND

## FINANCING TEXAS' PREMIER FIX-AND-FLIP & NEW CONSTRUCTION PROJECTS

**PASSIVE** TWO YEAR COMMITMENT | **8.25%\*** ANNUAL RETURN | **$250,000** MINIMUM INVESTMENT | QUARTERLY **INTEREST** DISTRIBUTIONS



NOBLE CAPITAL
RETIREMENT · PRIVATE LENDING · REAL ESTATE

*\*pure gross return*

ADVISOREDGE

## ABOUT | The Fund

Noble Capital, founded in 2002 with a focus on capital preservation and predictable income, provides Investors with premier real estate investment opportunities in Texas. The US Capital / Noble Capital Texas Real Estate Income Fund, LP (aka the "Signature Fund") fuels Noble Capital's primary business model of financing value-added real estate investment projects across the state for many of Texas' premier real estate investors. This joint venture by Noble Capital Group, LLC (Austin, TX) and US Capital Investment Mangement, LLC (San Francisco, CA) serves the needs of those Investors looking for higher yields with mitigated risk and predictability backed by a track record of performance.

## FEATURES | Benefits



**PROVEN STRATEGY**

With a nearly flawless record of almost $300MM deployed into investment property loans (as of Dec. 2016), the Signature Fund will allow Noble Capital to continue scaling its business operations. The strategy of financing investment properties at low loan-to-value ratios has remained in high demand as long as there has been a need for housing.

Unlike many direct investment opportunities where the investment is tied to one source of repayment, the Signature Fund is able to leverage multiple sponsors for repayment.



**MULTIPLE SPONSORS**



**HIGH YIELDS**

With high interest rate loan products designed to finance speculative real estate investment projects, the Signature Fund commands the highest yield (8.25%*) of Noble Capital's

Investors also participate in the profits created by any leverage obtained by the Fund *8.25% plus 20% profit participation.



**PROFIT PARTICIPATION**

## INVESTMENT | Strategy

The primary strategy for the Signature Fund takes advantage of alternative or private capital for client projects through Noble Capital's subsidiary loan origination company, Streamline Funding. The assets in the Signature Fund are mostly comprised of "fix-and-flip" loans and "new construction" loans for investors seeking to add value to distressed properties. The companies utilize our proven "Five C's Underwriting Philosophy" when considering loans for the Signature Fund. The "Five C's" are: Collateral, Credit, Credentials, Character and Cash. Founded in 2002, Streamline Funding has positioned itself as the industry leader amongst real estate investors seeking quick short-term capital for their investment projects.



SIGNATURE FUND

This document is provided for informational purposes only and does not constitute an offer to sell or a solicitation of an offer to buy any securities including, without limitation, any such investments. Any such offer will be made only to qualified investors by means of a written Private Placement Memorandum or similar document. All investments involve risk. Noble Capital does not make any guarantee or other promise as to any results of the Fund that may be obtained from this or any corresponding content.

## NOBLE CAPITAL

EXHIBIT B

# Noble Capital Issued CUSIP Securities Identification

*Noble Capital*

AUSTIN, Texas, March 27, 2018 (GLOBE NEWSWIRE) -- Noble Capital, a Texas-based financial planning and private investment firm specializing in real estate and retirement, announced today the issuance of its CUSIP Securities Identification and subsequent listing on Fidelity's alternative investment platform. This development makes the Company's investment Fund more broadly accessible to financial advisers and their clients nationwide.

"Obtaining our CUSIP is the culmination of many months of effort," Jadon Newman, CEO of Noble Capital said. "We worked closely with Fidelity who conducted a great deal of due diligence on Noble Capital and the Fund throughout this process. This brings us one step closer to executing our company's goals for 2018."

The CUSIP, or Committee on Uniform Security Identification Procedures, uniquely identifies a wide range of financial instruments and their issuers. It represents the accurate and efficient clearance and settlement of securities. CUSIP-based identifiers are assigned by CUSIP Global Services (CGS) which is managed on behalf of the American Bankers Association (ABA) by S&P Global Market Intelligence.

"Over the past year, our focus has been on growth and expanding the reach of our business," said Chris Ragland, COO for Noble Capital. "We're excited to bring this opportunity to a larger pool of advisers and potential investors through a highly reputable platform."

Since 2002, Noble Capital has provided funding for residential real estate rehab and new construction projects across the state of Texas. The Company's investment model offers substantial growth and predictable income to its network of private lenders and fund investors without the high level of volatility inherent in the stock market. All investments are supported by Noble Capital's construction control and loan servicing professionals, mitigating many risks associated with other investment models.

**About Noble Capital**
Noble Capital is a Texas-based alternative investment firm specializing in private lending, retirement strategy and real estate. It has developed unique approaches to wealth building and management, tailored to the modern financial landscape. Its Fund is known for generating substantial returns with a track record of consistently protecting client principal. Noble Capital has built an extensive network of private lenders and real estate professionals in Texas and is rapidly growing its portfolio backed by the most stable real estate market in the country. For more information, visit: www.noblecapital.com.

**Press Contact:**
Sean Harris
Noble Capital

Case 3:19-cv-02750-JSC   Document 1   Filed 05/20/19   Page 51 of 57

512-492-3814

# EXHIBIT C

# Noble Capital: A Texas-Based Story of Survival - Originate Report

*Since 2002, Noble Capital has provided funding for residential real estate rehab and new construction projects across the state of Texas. The company's investment model offers substantial growth and predictable income to its network of private lenders and fund investors without the high level of volatility inherent in the stock market. All investments are supported by Noble Capital's construction control and loan servicing professionals, mitigating risks associated with other investment models.*

As a young entrepreneur, Jadon Newman learned about the private lending industry during a family dinner. He was intrigued by the intricacies of finance and the success of an uncle in the industry, and so inspired he envisioned his own future in private lending. After learning the ropes from his uncle and various private lending groups in Southern California, he was determined to create his own company. In Austin, few competitors existed on the landscape. Newman thought Texas was ripe for the private lending industry and launched Noble Capital, one of the first companies to offer private lending in the region.

Since its launch in 2002, the company and the industry have blossomed. Noble Capital is not the only private lender in town anymore, but Newman still sees the company as a pioneer in its business model and lending and investing practices. It is not simply a private lending firm; it markets itself as an alternative investment firm specializing in private lending, retirement strategy and real estate with a $150 million portfolio. Noble Capital has built an extensive network of private lenders and real estate professionals in Texas and is rapidly growing its portfolio backed by the most stable real estate market in the country. With lessons learned from the 2008 financial crisis, Noble Capital aims today to be a leader for others to emulate and learn from — even if those "others" might be competitors — to improve industry standardization and ethics.

## Great Beginnings

To prove the business model was viable, Newman enlisted friends and family as initial investors, and later found additional investors by advertising in business periodicals and radio. With the first deeds of trust used to secure the loans, investors engaged in the model. That, says Newman, is the beauty of asset-based lending and the primary reason investors placed their trust in the company: Creating a track record and having security with collateral.

The company quickly increased to 30 employees before the financial crisis of 2008 hit. At its impact, the crisis created a sobering time for Newman and his staff, and presented an obvious fork in the road: folding the company or pressing forward with a revised set of company ideals.

Newman's choice, after consulting with staff, was to press forward and not give up. Against the advice of attorneys and counselors, the company did not file bankruptcy. "We stayed true to ourselves," says Newman. "One thing I am so proud of is we didn't change our name. We didn't reinvent ourselves. We're still Noble Capital. They say

you can't trust a man without a limp; the same is true for a company because they're not battle hardened and tested by fire, but we are. We stood up and faced the test and we're very grateful we were able to get through it. We had a lot of help and a little luck."

The strategy for survival was to transform the company into something far more nimble, incorporate the ability to respond rapidly to the marketplace and create additional capital resources.

First, the company decided to stop providing commercial loans and instead concentrate on one asset class: residential investment property. Second, the company completely eliminated its debt. And third, the company dialed in its REO strategy.

"We are 100% unleveraged today which is going to come across as very surprising to readers of this article," says Newman. "We built our $150 million portfolio unleveraged. That's one of the remarkable things we've been able to do.

"REO strategy is really an ugly part of the business. It's one thing to be a desk jockey and shuffle papers and write loans from the office; it's another thing to roll up your sleeves and manage broken assets. We had to learn the hard way the best formula to deal with REOs, and that's come through trial and error for sure."

Newman then brought in three partners: Chris Ragland as chief operating officer, Romney Navarro as chief lending officer, and Grady Collins as chief financial officer. "That's been an amazing ride, because now I've got four of us giving it 100% every day and we have a special partnership," says Newman. "Not all partnerships have the dynamics and the strengths that we bring to the table as the four owners of Noble Capital."

After the crisis, Noble Capital found itself as one of the few who made it through. "Very few operators today that are private lenders were also private lenders before 2008," explains Chris Ragland, chief operating officer. "Because of that, we have a lot of lessons we bring with us from that time. It was not your normal run of foreclosures but most of the portfolio was in trouble. How do you operate a business when you don't have revenue coming in? A lot of that comes down to your relationship with investors...we relate to the investors, the guys on the ground, the flippers or the new construction or loan originators. We understand their business because we've done it too."

## Current Business Model

What started as a deal shop became much more. The last 16 years have been spent perfecting the business model when no existing model fit. "While it's still not perfect, it's far beyond anything we imagined when we started doing 'deals,'" says Romney Navarro, chief lending officer who runs Noble Capital's lending company, Streamline Funding. "It's no longer a deal shop; it's an operating business with systems, people, processes, platforms, you name it. Others can do this, but they need to be disciplined and put a lot of time into it."

Raising capital from high net worth individuals always has been and will be the core of the company, but it has developed other sophisticated vehicles that skew more toward wealth building for investors and borrowers: the syndicating of loans and loan strategies; a fund on an institutional platform, Fidelity, that is known for generating substantial returns; and a partnership with investors on Wall Street. "We

are unique in that we don't have one capital partner," says Ragland. "We're able to have different capital partners that complement each other and help us grow the business in ways that wouldn't be possible otherwise."

The company's growth over the years sparked the creation of additional internal business units that provide predictable income and greater financial security for its clients: its private lending, retirement, and real estate divisions. This wealth management approach encapsulates not just one ideal but a lifelong plan that includes private lending and real estate as part of an individual's investment and retirement portfolio.

## Industry Challenges

The growth of the industry has led to significant challenges for Noble Capital and others. Since the market crash, the company is still hamstrung by lack of capital despite the amount of money raised and the size of their portfolio. "We have not been willing to change who we are or our underwriting profile or borrower clientele," says

Additional challenges are inherent for newcomers who bypass the established ethics and standards and create their own random processes, and the real estate industry suffers. This is where the Noble Capital team sees itself as a guide for newcomers. "The new competition coming into the marketplace that doesn't really understand the business, they structure or price deals wrong, bad things end up happening on those deals or in the marketplace because they don't know; they just don't get it," says Ragland. "What happens to businesses like ours that have been around a while — and we're very predictable in terms of our structure and pricing — but the marketplace gets disrupted by a new entrant who hasn't learned any of these lessons. They end up getting burned. It's a really interesting struggle to find balance in the marketplace and still structure our deals in a way where we know that if things got really bad, we can survive."

Some of these competitors are fresh graduates of a crash course in private money lending and they expect to get rich quickly. These courses may cost upward of $30,000, but the partners believe they provide far less of an education than experience provides. After one or two failed deals, they exit the market and leave in their wake a negative reputation for the industry. This is where the desire for industry leadership comes in. "We're big on educating; we want people to be successful," says Ragland. "Yes, we're trying to set the table for these guys, so they don't fail. That very fragmented marketplace — the onesie-twosie guys — exit the space after one or two unsuccessful deals. As an industry, we could be gaining so much more market share if we give them the tools and the resources. So, it's not only friendly, but we're literally extending a helping hand so people like us don't have to suffer the consequences of bad deals written by onesie-twosies."

To further influence ethical practices, Ragland serves as a member of the education committee of the American Association of Private Lenders. The organization's goal is to create ethics-based business practice standards for this burgeoning industry, and AAPL does this by providing continuing education content for the Private Lender Certification program.

At conferences, the partners often huddle with market competitors to share knowledge and information. "And it's not people from out of our service range," says Ragland, "it's people who work down the street from us. And we joke about it. 'We came all the way to Vegas to have a meeting when we're two miles away.' That's the

spirit. One of the unique things to our industry is how much we truly stand to benefit by helping each other."

The partners are enthusiastic about educating their peers and seeking ways to form alliances to further that ideal. One such alliance is Impact Hub's Affordable Housing Accelerator, in which Noble Capital and other Austin businesses partnered with community innovators to help solve the affordability crisis in Austin for low- and middle-income residents. Issues targeted included zoning laws, permitting processes and supply and demand of real estate. Noble's participation was to provide insight into the real estate and private lending industry to help guide the community in creating resolutions.

Noble Capital has been a financial sponsor since the accelerator's inception. The company also provides mentoring support for its participants. Additionally, Noble works directly with previous, current, and prospective accelerator members to provide alternative financing options that are aimed directly at providing additional housing inventory in Austin and the surrounding marketplace.

Affordable housing is important to Noble Capital because its employees, family and friends all live in Austin. The company gives preference to borrowers who are revitalizing housing stock in the high-demand, lower-price range by structuring its deals to take on more risk in the investment.

Despite the housing shortage and increasing prices, the partners see great things ahead for the company and the Texas market. In March, the company received the issuance of its CUSIP Securities Identification and subsequent listing on Fidelity's alternative investment platform. This development makes the company's investment fund more broadly accessible to financial advisers and their clients nationwide. "If you're a financial adviser, and you're looking for an alternative real estate bucket for your clients, you can put your client in this fund through the Fidelity platform and make money on it," says Newman. "It's an interesting way for us to scale and create more access to our fund."

For the next few years, Texas is poised to maintain its strong market. It was the last to go into the recession and the first to come out. The state is one of the fastest-growing populations in the United States and has three of the top 10 fastest-growing markets. With a low unemployment level, Texas is creating more jobs than the workforce can fill.

"The good news in Texas is we have a lot of land, we can build fast, and new construction levels are just now getting to the levels of pre-crisis and keeping up with the population that's coming to Texas," says Ragland. "A lot of people will talk about Texas and Austin in particular as being part of these bubbles, and bubble is a poor word to choose because a bubble is something that bursts. What Texas has created is an expanding economy that is requiring an expanding workforce, and the economy is expanding faster than the workforce, which is creating the increased value in real estate in Texas. How long can it go? No one should be able to predict that.

"There are so many jobs here, but for people moving here, there's not enough inventory. And that's the driver not only behind the increase in values, but also in our industry. That's what is creating the demand for fix and flips, and infill development where we're creating density where density was not present before."

Noble Capital intends to grow along with the state. The company aims to grow its

$150 million portfolio to $500 million and eventually identify other markets around the country to enter. "As we become more institutionalized and looked at as one of top national players," says Ragland, "we're preparing ourselves to go outside the state of Texas and that's part of our strategy: to figure out how to make that happen in an efficient way where it's going to be a win for the industry as whole.

Adds Newman, "We are very blessed to be in the heart of Texas; our headquarters are in Central Texas in Austin. So absolutely the four big cities — Austin, San Antonio, Houston, Dallas — all major markets all within a 2-3 hour drive is a very dynamic marketplace. We are grateful to be in that market."

What lies ahead for Noble Capital is more forging ahead of its own blueprint. With retirement planning, they're creating the next level of thought for investors and proving the alternative model: that private lending is the most forgiving and rewarding investment and should be a staple among retirement plans. With private lending, the company partners believe the open community in which they are inspiring, sharing and empowering each other will result in a stronger industry. And as long as Texas has jobs, the company will focus on filling the housing demand.

Noble Capital's future looks bright indeed.

*To learn more about Noble Capital and its partnership opportunities, contact Romney Navarro, Chief Lending Officer, at [rnavarro@noblecapital.com](mailto:rnavarro@noblecapital.com) or 512-249-2800.*