1  JEFFER MANGELS BUTLER & MITCHELL LLP
   JAMES NEUDECKER (Bar No. 221657)
2  *JNeudecker@jmbm.com*
   Two Embarcadero Center, Fifth Floor
3  San Francisco, CA 94111-3824
   Telephone:     (415) 398-8080
4  Facsimile:     (415) 398-5584

5  Attorneys for Plaintiff,
   US Capital/Nobel Capital Texas Real Estate
6  Income Fund, LP

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                     SAN FRANCISCO DIVISION

11

12 US CAPITAL/NOBLE CAPITAL TEXAS        Case No. 3:19-cv-02750-WHO
   REAL ESTATE INCOME FUND, LP,
13                                        **SECOND AMENDED COMPLAINT FOR:**
                 Plaintiff,
14                                        **(1)   CIVIL RICO (18 U.S.C. § 1962(c));**
          v.                              **(2)   CIVIL RICO (18 U.S.C. § 1962(d));**
15                                        **(3)   FRAUD;**
   JADON NEWMAN, CHRIS RAGLAND,           **(4)   FALSE ADVERTISING (15 U.S.C.
16 ROMNEY NAVARRO, GRADY COLLINS,                § 1125);**
   JADON NEWMAN (as trustee for JFN       **(5)   UNFAIR COMPETITION (Cal. Bus.
17 GRANTOR TRUST), HANNAH HEERLEIN              & Prof. Code §§ 17200 et seq. and
   (as trustee for N.A. NEWMAN HERITAGE         17500 *et seq.*);**
18 TRUST), HANNAH HEERLEIN (as trustee    **(6)   (the MASA);**
   for K.A. NEWMAN HERITAGE TRUST),       **(7)   BREACH OF CONTRACT (the
19 RAGLAND HOLDINGS, LLC, NOBLE                MOUs);**
   CAPITAL GROUP, LLC, NOBLE CAPITAL      **(8)   CONVERSION (Noble Capital
20 FUND MANAGEMENT, LLC, NOBLE                 Properties, Noble Capital Fund
   CAPITAL PROPERTIES, LLC, NOBLE              Management, and Noble Capital
21 CAPITAL SERVICING, LLC, NOBLE               Servicing;**
   CAPITAL REAL ESTATE, LLC (f/k/a        **(9)   CONVERSION (All Defendants);**
22 EMERGE REAL ESTATE GROUP, LLC),       **(10)  UNJUST ENRICHMENT;**
   STREAMLINE FUNDING GROUP, LLC,        **(11)  INTENTIONAL INTERFERENCE
23 NOBLE CAPITAL REO, LLC, NOBLE               WITH CONTRACTUAL
   CAPITAL INCOME FUND II, LLC, NOBLE          RELATIONS; and**
24 CAPITAL INCOME FUND III, LLC and      **(12)  ACCOUNTING**
   DOES 1-50,
25                                        **DEMAND FOR JURY TRIAL**
                 Defendant.
26

27

28

1    Plaintiff, US CAPITAL/NOBLE CAPITAL TEXAS REAL ESTATE INCOME FUND,

2   LP (the "Fund"), by and through the undersigned counsel hereby files and serves this Complaint

3   for Civil Violations of the Racketeer Influenced and Corrupt Organizations Act, Fraud, False

4   Advertising, Unfair Competition, Breach of Contract, Conversion, Unjust Enrichment, Intentional

5   Interference with Contractual Relations, and an Accounting, against JADON NEWMAN

6   ("Newman"), CHRIS RAGLAND ("Ragland"), ROMNEY NAVARRO ("Navarro"), GRADY

7   COLLINS ("Collins"), JADON NEWMAN as trustee for JFN GRANTOR TRUST ("JFN Trust"),

8   HANNAH HEERLEIN as trustee for N.A. NEWMAN HERITAGE TRUST ("NA Newman

9   Trust") and K.A. NEWMAN HERITAGE TRUST ("KA Newman Trust"), RAGLAND

10   HOLDINGS, LLC, ("Ragland Holdings"), NOBLE CAPITAL GROUP, LLC ("Noble Capital

11   Group"), NOBLE CAPITAL FUND MANAGEMENT, LLC ("Noble Capital Fund

12   Management"), NOBLE CAPITAL PROPERTIES, LLC ("Noble Capital Properties"), NOBLE

13   CAPITAL SERVICING, LLC ("Noble Capital Servicing"), NOBLE CAPITAL REAL ESTATE,

14   LLC f/k/a EMERGE REAL ESTATE GROUP, LLC ("Noble Capital Real Estate"),

15   STREAMLINE FUNDING GROUP, LLC ("Streamline"), NOBLE CAPITAL REO, LLC

16   ("Noble Capital REO"), NOBLE CAPITAL INCOME FUND II, LLC ("Income Fund II"),

17   NOBLE CAPITAL INCOME FUND III, LLC ("Income Fund III"), and DOES 1-50 (collectively

18   "Defendants").

19                    **JURISDICTION AND VENUE**

20    1.    This Court possesses federal question jurisdiction pursuant to 28 U.S.C. § 1331

21   with respect to claims asserted under 15 U.S.C. § 1125 and 18 U.S.C. § 1962.

22    2.    This Court possesses supplemental jurisdiction pursuant to 28 U.S.C. § 1367 with

23   respect to the remaining claims asserted herein.

24    3.    Personal jurisdiction is proper as to Defendant Newman because:  (1) Defendant

25   Newman  purposefully availed himself of the benefits of the State of California; (2) the

26   controversy is related to and arises out of Defendant Newman's contacts with the State of

27   California; and (3) the assertion of personal jurisdiction comports with fair play and substantial

28   justice.

JMBM | Jeffer Mangels Butler & Mitchell LLP

4.      Personal jurisdiction is proper as to Defendant Ragland because: (1) Defendant Ragland purposefully availed himself of the benefits of the State of California; (2) the controversy is related to and arises out of Defendant Ragland's contacts with the State of California; and (3) the assertion of personal jurisdiction comports with fair play and substantial justice.

5.      Personal jurisdiction is proper as to Defendant Navarro because: (1) Defendant Navarro purposefully availed himself of the benefits of the State of California; (2) the controversy is related to and arises out of Defendant Navarro's contacts with the State of California; and (3) the assertion of personal jurisdiction comports with fair play and substantial justice.

6.      Personal jurisdiction is proper as to Defendant Collins because: (1) Defendant Collins purposefully availed himself of the benefits of the State of California; (2) the controversy is related to and arises out of Defendant Collins's contacts with the State of California; and (3) the assertion of personal jurisdiction comports with fair play and substantial justice.

7.      Personal jurisdiction is proper as to Defendant Noble Capital Group because: (1) Noble Capital Group purposefully availed itself of the benefits of the State of California; (2) the controversy is related to and arises out of Noble Capital Group's contacts with the State of California; and (3) the assertion of personal jurisdiction comports with fair play and substantial justice.

8.      Personal jurisdiction is proper as to Defendant Noble Capital Fund Management because: (1) Noble Capital Fund Management purposefully availed itself of the benefits of the State of California; (2) the controversy is related to and arises out of Noble Capital Fund Management's contacts with the State of California; and (3) the assertion of personal jurisdiction comports with fair play and substantial justice.

9.      Personal jurisdiction is proper as to Defendant Noble Capital Servicing because: (1) Noble Capital Servicing purposefully availed itself of the benefits of the State of California; (2) the controversy is related to and arises out of Noble Capital Servicing's contacts with the State of California; and (3) the assertion of personal jurisdiction comports with fair play and substantial justice.

10.     Personal jurisdiction is proper as to Noble Capital Properties because:  (1) Noble Capital Properties purposefully availed itself of the benefits of the State of California; (2) the controversy is related to and arises out of Noble Capital Properties' contacts with the State of California; and (3) the assertion of personal jurisdiction comports with fair play and substantial justice.

11.     Personal jurisdiction is proper as to Defendants Noble Capital Real Estate, Streamline, Noble Capital REO, Income Fund II, Income Fund III, Jadon Newman as trustee for JFN Trust, Hannah Heerlein as trustee for NA Newman Trust and KA Newman Trust, and Ragland Holdings (collectively, the "Added Defendants").  The Added Defendants purposefully availed themselves of the benefits of the State of California and intentionally took part in a conspiratorial enterprise which damaged the Fund, a limited partnership with its principal place of business in California, with knowledge that their actions would cause harm in California. Personal jurisdiction is also proper in this Court as to the Added Defendants because this Court already has jurisdiction over at least one of the participants in the alleged conspiracy, and "the ends of justice" require such jurisdiction in this matter pursuant to 18 U.S.C. § 1965(b).

12.     Venue is proper in this jurisdiction pursuant to 28 U.S. Code § 1391 because a substantial part of the events giving rise to the claims occurred in the Northern District of California.  Defendants conducted business in the Northern District of California and engaged in many of the acts alleged in the course of that business, including traveling to the Northern District of California to conduct negotiations regarding the subject matter of the Complaint.

## **PARTIES**

13.     The Fund is a limited partnership created pursuant to the laws of the State of Delaware with its principal place of business located at 555 Montgomery Street, Suite 1501, San Francisco, California.

14.     Defendant Jadon Newman holds himself out to the public as the Chief Executive Officer of Noble Capital Group and various additional Noble Capital entities.  On information and belief, Newman is a resident of Texas.  Newman is a manager of Noble Capital Group as well as

1  other Noble Capital entities, and has an ownership interest in Noble Capital Group due to his

2  ownership of the Newman trusts referenced below in paragraphs 18-19.

3      15.    Defendant Chris Ragland holds himself out to the public as the Chief Operating

4  Officer of Noble Capital Group and various additional Noble Capital entities.  On information and

5  belief, Ragland is a resident of Texas.  Ragland is a member of Noble Capital Group and holds an

6  ownership interest in it due to his ownership of Ragland Holdings.

7      16.    Defendant Romney Navarro holds himself out to the public as the Chief Lending

8  Officer of Noble Capital Group and various additional Noble Capital entities.  On information and

9  belief, Defendant Navarro is a resident of Texas.  Navarro is a member of Noble Capital Group.

10     17.    Defendant Grady Collins holds himself out to the public as the Chief Financial

11 Officer of Noble Capital Group and various additional Noble Capital entities.  On information and

12 belief, Collins is a resident of Texas.  Collins is a member of Noble Capital Group and is the

13 manager of several Noble Capital subsidiaries, including Noble Capital Fund Management.

14     18.    Defendant Jadon Newman is the trustee for JFN Trust, which owns or controls a

15 portion of Noble Capital.  On information and belief, JFN Trust was created pursuant to the laws

16 of the State of Texas, with its principal place of business in Texas.  Defendant Newman owns and

17 controls the JFN Trust, which is a member of Noble Capital Fund Group, Noble Capital Fund

18 Management, and the larger Noble Capital enterprise.  All actions taken by Newman as a manager

19 and CEO of Noble Capital were also taken by the JFN Trust as member.

20     19.    Defendant Hannah Heerlein is the trustee for NA Newman Trust and KA Newman

21 Trust, which own or control a portion of Noble Capital.  On information and belief, NA Newman

22 Trust and KA Newman Trust were created pursuant to the laws of the State of Texas, with their

23 principal place of business in Texas.  Defendant Newman owns and controls NA Newman Trust,

24 which is a member of Noble Capital Group and the larger Noble Capital enterprise.  All actions

25 taken by Newman as a manager and CEO of Noble Capital were also taken by NA Newman Trust

26 and KA Newman Trust as members.

27     20.    Defendant Ragland Holdings owns or controls a portion of Noble Capital.  On

28 information and belief, Ragland Holdings was created pursuant to the laws of the State of Texas,

JMBM | Jeffer Mangels Butler & Mitchell LLP

1    with its principal place of business in Texas.  Defendant Ragland owns and controls Ragland

2    Holdings, LLC, which is a member of Noble Capital Group and the larger Noble Capital

3    enterprise.  All actions taken by Ragland as a manager and COO of Noble Capital were also taken

4    by Ragland Holdings as member.

5         21.    Defendant Noble Capital Group is a limited liability company created pursuant to

6    the laws of the State of Texas, with its principal place of business located at 8200 N. Mopac

7    Expressway, #320, Austin, Texas.  Noble Capital Group is the parent entity to the other Noble

8    Capital subsidiary entities.

9         22.    Defendant Noble Capital Fund Management is a limited liability company created

10   pursuant to the laws of the State of Texas, with its principal place of business located at 8200 N.

11   Mopac Expressway, #320, Austin, Texas.

12        23.    Defendant Noble Capital Servicing is a limited liability company created pursuant

13   to the laws of the State of Texas, with its principal place of business located at 8200 N. Mopac

14   Expressway, #320, Austin, Texas.

15        24.    Defendant Noble Capital Properties is a limited liability company created pursuant

16   to the laws of the State of Texas, with its principal place of business located at 8200 N. Mopac

17   Expressway, #320, Austin, Texas.

18        25.    Defendant Noble Capital Real Estate is a limited liability company created pursuant

19   to the laws of the State of Texas, with its principal place of business located at 8200 N. Mopac

20   Expressway, #320, Austin, Texas.

21        26.    Defendant Noble Capital REO is a limited liability company created pursuant to the

22   laws of the State of Texas, with its principal place of business located at 8200 N. Mopac

23   Expressway, #320, Austin, Texas.

24        27.    Defendant Streamline is a limited liability company created pursuant to the laws of

25   the State of Texas, with its principal place of business located at 8200 N. Mopac Expressway,

26   #320, Austin, Texas.

27

28

28.     Defendant Noble Capital Income Fund II is a limited liability company created pursuant to the laws of the State of Texas, with its principal place of business located at 8200 N. Mopac Expressway, #320, Austin, Texas.

29.     Defendant Noble Capital Income Fund III is a limited liability company created pursuant to the laws of the State of Texas, with its principal place of business located at 8200 N. Mopac Expressway, #320, Austin, Texas.

## SUBSTANTIVE ALLEGATIONS

I.     **Overview**

30.     This Action is based on a wide-ranging pattern of fraudulent, unlawful, and unfair competitive conduct by four business partners:  Defendants Newman, Ragland, Navarro, and Collins (collectively, the "Individual Defendants").  The Individual Defendants own and operate dozens of corporate alter ego entities, whose activities they often discuss under the general banner of "Noble Capital," an enterprise-in-fact.

31.     On information and belief, Noble Capital's interrelated companies provide investment opportunities to high-net-worth retirees and other investors, primarily in the form of fractionalized partnerships with assets built around "hard-money" lending, *i.e.* short-term high interest construction loans to borrowers that are secured by real property.

32.     Noble Capital describes its hard-money lending business as a "vertically integrated" organization, which means that, through various corporate entities, it not only procures funds to invest, but also originates, diligences, structures, and services loans, and then manages defaulted loans on the back end through aggressive foreclosures, among other things.  At every step of the way, Noble Capital generates substantial income, in the form of advisory, origination, servicing, sales, workout fees, capital gains for cash profits, and/or capital losses for tax-loss benefits, which are taken out of the pocket of investors.

33.     Noble Capital's business depends on its highly curated—and highly misleading—general public advertising practices.  To obtain funds from investors, Noble misleads retiree and non-retiree investors in a number of ways.  It guarantees, without any basis or caveat, that it can deliver above-market, 8.25% returns with no risk of loss.  It falsely represents to investors that it

has obtained credentials and regulatory clearances in its own name that it has not obtained.  It freerides off of the name, credentials, and goodwill of entities like the Fund without proper attribution.  It lies to investors about its extensive history of bankruptcies, claiming instead that it has not declared bankruptcy.  And it lies to investors about its leverage, falsely claiming that it is entirely unleveraged.

34.     The Fund, which manages approximately $24,000,000 in assets, funds high-yield senior secured first-lien mortgages on residential real-estate.  The Fund is one of Noble Capital's primary business partners, and also one of Noble Capital's primary victims.  Due to Noble Capital's misconduct, the Fund has also become one of Noble Capital's largest creditors.

35.     The Fund and Noble Capital's relationship is based on a series of contracts including a Management Advisory Services Agreement ("MASA") and a Limited Partnership Agreement ("LPA") wherein Noble Capital recruits limited partner investors into the Fund and then uses its suite of companies to recommend, originate, and manage real-estate loans for the Fund with the goal of earning interest income.  Noble Capital's primary duties include diligencing borrowers, recommending sound loans to the Fund, originating loans that the Fund approves, acting as a loan servicer (*i.e.* collecting payments and forwarding them to the Fund and keeping books and records), and working out troubled loans.  But from the start, the Individual Defendants used their Noble Capital enterprise to defraud the Fund out of substantial assets.

36.     Specifically, Defendants serially furnished false and misleading credit memoranda to the Fund to induce it to fund loans that Defendants knew posed an unacceptable risk of default. These memoranda falsely represented that borrowers' credit and background reports "came back clear," when in reality, certain borrowers had multiple foreclosures, while others were already in default to other Noble-controlled entities.

37.     As a result, 13% of the loans that Noble sourced for the Fund (representing 17% of the Fund's total assets) defaulted, casting a cloud over millions of dollars in Fund assets.  That is no coincidence; Defendants' overarching plan was to shift losses from other Noble-controlled entities to the Fund through the fraud described above, while concealing the underlying facts from the Fund.

38.     To that end, Noble has refused to provide the Fund's independent auditor with access and documents requested in an attempt to hide its misdeeds and has falsely claimed that it does not have the capability to produce monthly loan statements for any particular loan.  It has also ceased forwarding any principal or interest payments on the loans in the Fund's portfolio since May 20, 2019, and as a result, has wrongfully commandeered millions of dollars of assets that it has no entitlement to.

39.     This pattern of fraud has resulted in losses for the Fund while simultaneously resulting in gains for the Individual Defendants and their Noble Capital enterprise.

40.     The Fund's substantial losses are compounded by the fact that Noble Capital promised the Fund's investors above-market, 8.25% returns, which the Fund has been unable to deliver.  This too harms the Fund while advantaging Noble Capital, because Noble Capital uses the Fund's underperformance to besmirch the Fund and divert its investors into other Noble-controlled funds.

41.     Moreover, in September 2019, Noble Capital unlawfully raided and caused the transfer of all of the Fund's assets (over $26 million, including more than $2 million in interest income), away from the Fund into other investment vehicles solely owned and controlled by the Defendants, without any notice to the Fund, without any right to do so, and in contradiction of the LPA and MASA.

42.     Noble's conduct, as described more fully below, has harmed the Fund economically and competitively, giving rise to claims for civil violations of the Racketeer Influenced Corrupt Organizations Act ("RICO"), Fraud, False Advertising, Unfair Competition, Breach of Contract, Conversion, and Unjust Enrichment.

## II.     The Individual Defendants Organized an Enterprise Consisting of Numerous Alter Ego Entities

43.     The Individual Defendants own and operate a web of alter-ego entities that they refer to interchangeably as "Noble Capital" or "Noble" (hereafter, "Noble Capital" or "Noble").

44.     The Individual Defendants, who are all officers of Noble Capital and partners to one another, operate Noble Capital as an enterprise-in-fact.

45.     As described by Defendant Newman, "[n]ot all partnerships have the dynamics and the strengths that we bring to the table as the four owners of Noble Capital."  The full extent of each of their involvement in the Noble Capital enterprise and its dozens of alter-ego subsidiaries is still under investigation.

46.     Plaintiff is informed and believes, and on that basis alleges, that all of the Noble Capital entities are treated as interchangeable among the Individual Defendants.  All or substantially all of the Noble Capital entities reside at the same address and are run by individuals who each use one @noblecapital.com e-mail address regardless of the entity on whose behalf they are acting.  On information and belief, the Individual Defendants transfer assets and monies, including personal assets, in and among these entities without exchanging appropriate consideration or respecting corporate formalities for illegitimate purposes.

47.     As such, at all relevant times, the Noble Capital related entities were alter egos of the Defendants Newman, Ragland, Navarro, and Collins, and alter egos of one another, in that at all times there existed such a unity of interest in ownership between the Noble Capital entities and the Individual Defendants and between Noble Capital subsidiary entities and one another that any separateness has ceased to exist between them.

48.     Plaintiff is informed and believes, and on that basis alleges, that Defendants have structured their enterprise-in-fact in such a way as to permit them to funnel assets into certain Noble Capital entities as needed to preserve the Individual Defendants' compensation, to prop up the balance sheets and associated investment returns of certain Noble Capital entities, to stow losses in other Noble Capital entities for purposes of opportunistic bankruptcies, and to lay blame at the feet of partners, like the Fund, who are involved in certain of those entities.

49.     On information and belief, the Individual Defendants control or have controlled several dozen limited liability companies and limited partnership entities, which they have used over the past decade as vehicles to mislead business partners, competitors, and the investing public about the location and size of their assets and liabilities.

50.     These Noble Capital entities include Noble Capital Group, Noble Capital Fund Management, Noble Capital Properties, Noble Capital Servicing, Noble Capital Real Estate,

Streamline, and others, which hold themselves out to the public as specialists in retirement investment planning, private lending of "hard money" loans, and real estate owned ("REO") workouts.

51.     The following chart illustrates some of the key Noble Capital entities at issue in this litigation, which are related by ownership and/or management:



III.    **Noble Capital's Obligations to the Fund**

52.     The Fund is organized pursuant to a Limited Partnership Agreement between the general partner of the Fund and its limited partners that is also in accordance with the Private Placement Memorandum (sometimes referred to as "PPM") of the Fund.

53.     The overarching purpose of the Fund as delineated in the LPA and PPM was to preserve Fund principal and achieve consistent short-term income primarily through senior secured first-lien mortgages on residential real estate.

54.     The LPA provides in section 8.1 that US Capital Global Investment Management, LLC will act as the Fund's general partner and have the exclusive right to manage, control, and conduct the business of the Fund.  Similarly, in a "Private Placement Agreement," the Fund and various Noble Capital entities, as well as the Individual Defendants, engaged US Capital Global

Securities, Inc. (collectively with US Capital Global Investment Management, LLC "US Capital")
to act as the Fund's exclusive placement agent.

55.     Some of the key responsibilities for effectuating the goals of the LPA and PPM
were memorialized in the "MASA" between the Fund and Noble Capital Fund Management,
which governs the Fund's business relationship with multiple Noble entities.  Pursuant to the
MASA, the Noble entities agreed to:

- source, and originate prospective real estate transactions for the Fund;

- conduct due diligence on prospective borrowers;

- structure, securitize, document, and execute transactions based on due
diligence;

- manage the portfolio of loans with respect to collateral monitoring, cash
management, and any other activities as requested by the Fund;

- exit, and liquidate holdings; and

- repossess, restructure, or otherwise remedy properties or borrowers in
events of default to preserve Fund assets.

56.     The diagram below connects the three signatories to the MASA to the purple block
that represents the MASA.  The diagram then further shows the other Noble Capital entities that
Noble Capital Fund Management, LLC utilized to perform its obligations under the MASA:



IV.   **The Individual Defendants and Noble Capital Defraud the Fund into**
      **Taking Bad Loans for Their Personal Gain**

57.    On information and belief, the Individual Defendants, acting through their Noble Capital entities, never intended to uphold their contractual obligations to the Fund or its individual retirement account investors, and instead intended to siphon Fund assets through a coordinated scheme.

58.    The MASA tasks the Noble entities with conducting appropriate due diligence on prospective borrowers and making funding recommendations to the Fund, among other things.

59.    Yet, instead of conducting appropriate due diligence on prospective borrowers, Defendants intentionally recommended bad loans that had an unacceptable risk of default. Defendants stood to gain from those loans whether or not they performed because they obtained substantial origination and servicing fees on the front end through the entities Noble Capital Servicing, Noble Capital Fund Management, and Streamline Funding Group, and substantial workout fees and profits on the back end through the entities Noble Capital Real Estate, Noble Capital REO, and Noble Capital Properties.

60.    Defendants' scheme to defraud the Fund was effectuated through a series of false and/or highly misleading credit memoranda that were provided to the Fund to induce it to take on bad loans.

61.    For example, on April 25, 2017, Defendants sent a credit memorandum to the Fund signed by Defendant Ragland recommending that the Fund finance a loan to FDI Divine Property Group, LLC ("FDI"). According to the credit memorandum, Noble ran background reports for FDI's owners that "came back clean." But in reality, the manager of FDI, who signed for the note, had three foreclosures in the ten-year period leading up to this promissory note, the most recent of which was recorded in March 2016. Even worse, Noble Capital had actually entered into this loan in July 2016, a mere four months after that recent foreclosure. Thus, by the time the Fund was brought into the transaction, Noble had been dealing with FDI and its owners for nine months. Soon after the Fund stepped in, FDI defaulted on the loan, causing the Fund losses.

JMBM | Jeffer Mangels
Butler & Mitchell LLP

62.     Similarly, on April 20, 2017, Defendants sent a credit memorandum signed by Defendants Ragland and Collins to the Fund recommending that it fund a loan to Northshore Homes.  As with the previous loan, the credit memorandum stated that all background checks "came back clear."  But a title, lien, and registration report on Northshore Homes reveals that it has had 17 foreclosures and 18 judgments entered against it.  On information and belief, many or all of those predated the loan that Noble Capital recommended.  Furthermore, as with other bad loans, Noble Capital had actually entered into this loan seven months before it recommended it to the Fund.  Accordingly, Noble knew or recklessly disregarded the fact that it would go into default, which is exactly what happened.

63.     As a final example, on September 25, 2017, Defendants sent a credit memorandum signed by Defendant Collins to the Fund recommending that it fund a loan to Loved Homes of Austin, LLC ("Loved Homes").  The credit memorandum was issued in support of the transaction and noted that all background checks "came back clear."  As with the loans to FDI and Northshore Homes, Noble Capital had actually entered into the loan with Loved Homes much earlier, on October 26, 2016, eleven months before it recommended the loan to the Fund.  Remarkably, Noble Capital itself caused a notice of default to be filed on behalf of James Wiggins against Loved Homes just *three months* before it recommended that the Fund step in with funding.  As with the other bad loans, Loved Homes quickly defaulted.

64.     To make matters worse, Defendants misled the Fund into believing that Noble Capital had tightened its diligence process to ensure that borrowers had appropriate experience and credentials, among other things.  Defendant Ragland described these "credentials" in a video for the general investing public as follows:  "If they don't know what they're doing, if they haven't done it before, there's no reason we should give them a loan and let them try it out on us. So if they don't have experience or credentials, not gonna happen."  *See* https://www.youtube.com/watch?v =a36wkjzTr0A (last accessed May 17, 2019 at 2:57 p.m.). Borrowers with lengthy foreclosure histories or very recent defaults very obviously do not have "credentials."

65.     Plaintiff's investigation is ongoing, but Plaintiff expects to uncover additional acts of fraud and misconduct by Defendants.

66.     As a result of Defendants' fraudulent credit memoranda and intentional diligence failures, 13% of the loans that Defendants originated for the Fund (representing 17% of the Fund's assets) defaulted.  Many of the defaults were "early payment defaults," which is an industry term of art for loans that are so atrocious that the borrower defaults without ever making a single payment.

67.     Part of Defendants' overarching plan was to defraud the Fund into taking on bad debt from other Noble-controlled entities.  This served Defendants' unlawful enterprise scheme because it allowed Defendants to conceal losses in other Noble subsidiaries by transferring them to the Fund.  The Fund is informed and believes, and on that basis alleges, that shifting bad loans among their various entities was Defendants' *modus operandi* dating back nearly a decade, and it has enabled them to extract additional money from their scheme from a wider pool of individuals over a lengthy timeframe.  As a result, the Fund has discovered at investor events that it is not the only victim of the Noble Capital scheme.

68.     For example, the Fund is informed and believes, and on that basis alleges that, in a non-Fund transaction, Noble Capital recommended a borrower who previously had numerous foreclosures entered against him.  His loans through Noble went into foreclosure, which caused losses.  Yet Noble profited—in addition to the substantial origination and servicing fees it obtained on the front end, most of the renovation work on the subject properties had been completed at the time of default, which resulted in a windfall for Defendants on the back end. Making matters worse, the borrower on that loan has publicly stated that Defendants forced this property into foreclosure by wrongfully denying a final draw on his loans, to cause a default.

69.     When the Fund brought Defendants' unacceptably high-default rate to their attention in Q2 2018, Defendants agreed to purchase the defaulted loans from the Fund.  As described more fully *infra* at Part VI, this led to a separate set of wrongful conduct by Defendants that damaged the Fund.

Jeffer Mangels
Butler & Mitchell LLP

JMBM

70.     In addition to the defaults already described, Noble Capital purchased a further set of defaulted loans in Q3 and Q4 2018.  These loans amounted to approximately 5% of all loans Defendants originated for the Fund.

71.     Just like the initial set of bad loans, some of these were early payment defaults. The Fund has been forced to seek out a third-party servicer for collections and workouts for these additional loans.

72.     Defendants have kept the substantial loan origination fees generated by these loans. On information and belief, Defendants have also pocketed substantial gains from foreclosing on the properties that secured the defaulted loans through their companies Noble Capital Real Estate and Noble Capital REO, and indeed, have converted many of these properties for their own gain, as set forth further below.

73.     Defendants did this by entering into loans that posed an unacceptable degree of risk so that they could generate origination and servicing fees on the front end, and work-out fees and other REO-related windfalls on the back end, all while attempting to conceal the losses that they were incurring from the Fund and its investors.

74.     Defendants were motivated to transact with the Fund to obtain certain certifications and credentials that the Fund – but not Defendants – had the qualifications and wherewithal to obtain.  Defendants used these valuable credentials to mislead investors into thinking that Noble entities had gone through third-party diligence and audit processes, and received certifications and approvals, that they had not gone through or obtained.

75.     Defendants were further motivated to transact with the Fund to increase their amount of funds under management (which they generate proportional fees from), to establish essentially a $24,000,000 revolving line of credit through the Fund's assets under management, to be able to draw on that credit to fund loans without having to cobble together a group of individual investors (which was Noble's pre-Fund practice), to access the lending market for deals larger than $500,000 (which Noble was unable to consistently access prior to its partnership with the Fund), and to freeride off of the fact that the Fund is audited annually by a neutral third-party (which high-net-worth investors understand and care about).

V.    **The Individual Defendants and Noble Capital Engage in False**
       **Advertising and Unfair Competition**

76.    Defendants' scheme goes well beyond harming the Fund's existing assets under management and extends to the Fund's reputation, goodwill and business opportunities.

77.    Defendants' business revolves around a curated assortment of folksy marketing techniques that are, in fact, an overarching false advertising scheme.  Defendants solicit investors through steakhouse "retirement seminars," quarterly "state of the company" seminars, and other informational events featuring wine, "brews," and "authentic Texas BBQ."  At these events, high-net-worth retirees and other potential investors are treated to free food and alcohol, before imbibing Noble Capital's misleading and false investment advertising.

78.    Below is an image of the web portal for Noble Capital's upcoming events, which was captured from noblecapital.com/resources/events on May 7, 2019 at 3:07 p.m.

NOBLE CAPITAL / EVENTS



RETIREMENT SEMINARS



STATE OF THE COMPANY

79.    The individuals in the image above in the righthand column are, from left to right, Defendant Newman, Defendant Collins, Defendant Ragland, and Defendant Navarro.

80.    Defendants use a similar folksy approach to create a false sense of security and trust via their online and print marketing scheme.  Among other things, Defendants have created

multiple "candid" interviews with Newman, Collins, and Ragland, numerous other highly produced but misleading advertising videos, and a weekly radio show, all of which contain numerous misrepresentations.

81.     Noble Capital's systematic pattern of misrepresentation, false advertising and unfair competition against the Fund includes, without limitation, the following specific acts, which are described further in the sections that follow:

>   (A)     freeriding off of the Fund's CUSIP, goodwill, name, and reputation, to divert investors into their own wholly-controlled investment vehicles;
>
>   (B)     falsely promising guaranteed no-risk returns, then attempting to manipulate cost accounting to meet those goals and attributing shortfalls to the Fund; and
>
>   (C)     unfairly competing with the fund by misleading investors about Noble Capital's extensive bankruptcy history and falsely claiming to be unleveraged.

82.     Defendants false and misleading statements are attributed either to the Individual Defendants directly, as described more specifically below, or more generally to Noble Capital or Noble without specific attribution.  Noble Capital Group and Noble Capital Fund Management are the primary entities who use those statements to funnel investors into Noble-controlled funds.

83.     On information and belief, Defendants have diverted millions of dollars in investment monies from the Fund through Defendants' false advertising scheme and caused other financial and regulatory harms to the Fund.

**A.     Defendants Use the Fund's CUSIP, Goodwill, Name, and Reputation to Mislead Investors**

84.     The Fund, through the efforts of US Capital, applied for and obtained a CUSIP number—a unique, nine-digit alphanumeric code that identifies it as a financial security under the standards of the Committee on Uniform Security Identification Procedures—for use in listing and advertising the Fund's offering.

85.     Defendants trade on the CUSIP number of the Fund, and by extension, its reputation and name, by using it in advertisements for Noble entities without permission or attribution.

86.     This misleads investors into believing that the Noble entities have achieved financial safety and soundness benchmarks that have been verified by third-party monitoring entities, when in fact only the Fund has those credentials.

87.     For example, on March 27, 2018, Noble Capital published a fraudulent press release, attached here as **Exhibit B**, with the headline "Noble Capital Issued CUSIP Securities Identification."

88.     In that same release, Defendant Newman misled investors by asserting:  "Obtaining ***our CUSIP*** is the culmination of many months of effort . . . ***We worked closely with Fidelity who conducted a great deal of diligence on Noble Capital*** and the Fund throughout this process." (Emphasis added.)

89.     Similarly, Defendant Ragland stated:  "We're excited to bring this opportunity to a larger pool of advisers and potential investors through a highly reputable platform."

90.     Noble Capital further stated: "The CUSIP, or Committee on Uniform Security Identification Procedures . . . represents accurate and efficient clearance and settlement of securities."

91.     This press release was not an outlier.  In Noble Capital's Q1 2018 "State of the Company" report, which was published on Noble Capital's website on or around April 24, 2018, Noble Capital misleadingly stated:  "After many months of work and third-party due diligence, we were issued a CUSIP securities identification for our Signature Fund."

92.     Likewise, in Noble Capital's Q2 2018 "State of the Company" report, which was published on Noble Capital's website on June 27, 2018, Noble Capital misleadingly referred to "[t]he issuance of Noble Capital's CUSIP identification and subsequent Fidelity listing last quarter . . . ."

93.     All of these references to Noble's CUSIP are misleading because Noble Capital does not have a CUSIP.  The Fund has a CUSIP.

94.     Having lured investors through Noble's door by freeriding on the credentials of the Fund, Defendants wrongfully divert them into other Noble funds and investment vehicles by (1) portraying the losses that the Fund was unwilling to cover as the Fund's fault rather than Noble's, and (2) saddling the Fund with the lowest performing loans of any of the funds that Noble manages.

95.     For example, in Noble Capital's Q1 2019 "State of the Company" presentation, Defendant Collins showed slides comparing the Fund's non-performing notes unfavorably to two Noble-controlled funds that were created in February 2019 to compete with the Fund, "Income Fund II" and "Income Fund III."  After describing the Fund's non-performance rate of 7.5%, Collins showed Income Fund II's performance slide, which looks like this:



Collins stated:  "Performance, this is the one I want to highlight.  I don't think there's a ranking for private lending debt funds, but if there were as far as performance goes, we're tied for #1 in the world.  Can anybody else say that they're in a real estate debt fund that's the #1 performing debt fund in the world.  I'm gonna say it again because I may [sic] be able to say it again next quarter.  Right now we're tied #1 in the world in performance.  We've talked a lot about that earlier, superior performance, [Defendant Navarro] talked about it in underwriting, that's definitely a reflection here in our fund with [sic] you can't get much superior [sic] than that."

96.     For Income Fund III, Defendant Collins displayed a slide showing 95% performing notes, and stated:  "Can't quite say we're tied for #1, but we're up there pretty high."

97.     This comparison, in conjunction with Defendant's messaging to individual investors about the Fund's management, was designed to mislead investors and divert them from the Fund into Income Funds II and III and other Noble-controlled funds.  This is misleading for the additional reason that Noble Capital made all of the loan funding decisions for all three funds.

**B.**     **Defendants Falsely Promise Guaranteed No-Risk Returns, Then Attempt to Manipulate Results to Meet Those Goals and Mislead Investors About Performance**

**1.**     **Defendants Mislead Investors by Promising Guaranteed Returns**

98.     Defendants improperly and misleadingly advertise the Fund, as well as several of Noble Capital's other investment offerings, as guaranteeing a higher-than-market return, without any disclosure of the risk of loss.  They then seek to manipulate actual returns to mislead investors about the substantial losses they have incurred.

99.     For example, on January 23, 2018, Noble Capital published to its website an advertisement for the Fund without obtaining the Fund's consent that promises investors an "8.25%* annual return."  A copy of this advertisement is attached here as **Exhibit A**. Remarkably, the "*" icon directs the reader to a footnote which, instead of containing appropriate cautionary language, furthers the lie by promising the 8.25% as a "pure gross return."  This is what that ad looks like:



100.    This is a false advertisement.  In reality, none of the funds controlled by Defendants are able to generate a guaranteed 8.25% return or any guaranteed return, and the Fund has fallen short of that mark on multiple occasions.

101.    This misleading advertisement is not an outlier – rather, it is one of countless instances in which Defendants repeat this same false promise.  For example, on Noble Capital's Yelp page, a quote attributed to Defendant Ragland used to state (but has since been removed), that "Noble Capital's members earn 8-10% interest on their money, short term, backed by real estate."  *See* https://www.yelp.com/biz/noble-capital-austin-2 (accessed May 6, 2019 at 10:41 p.m.). This is what that looked like:

## Meet the Manager

 **Chris R.**
Manager

Chris Ragland is currently the Chief Operating Officer of Noble Capital.

The mission of Noble Capital is to be Texas' premiere Private Real Estate Lending Platform, providing quality lending opportunities to members of our Private Lender Network.

Noble Capital's members earn 8-10% interest on their money, short term, backed by real estate.

102.    Similarly, Noble Capital's website and its YouTube channel prominently feature a misleading one-minute introductory video wherein Noble Capital states: "HOW WOULD YOU LIKE TO EARN 8-10% INTEREST ON YOUR MONEY?"  That assertion is not, at any point, accompanied by cautionary language.  Here is a still frame taken from https://www.youtube.com/watch?v= nkAXXADQaYg on Monday May 6, 2019 at 10:19 p.m.:



103.    In addition, Defendants reinforce the message that their investments are guaranteed by claiming they "offer a preferred return and no fluctuation with RE swing" on the Noble Advisor Edge website, noblecapital.com/investor-relations/advisor-edge:

///////////////

INVEST    ADVISOR EDGE    OUR TEAM    BLOG    CONTACT

✕ What makes this different than a REIT?

Our investment model differs from REITs in the following ways:

• They are privately traded.

• We only deal with Texas-based single-family real estate, not commercial or multi-family properties.

• You can use cash or qualified money to invest directly in these properties unlike REITs which require that you invest through a company, exchange-traded fund or mutual fund.

• They offer a preferred return and no fluctuation with RE swing.

• They are taxed as K-1.

• There is no research needed on how that property's market is doing or if it is cash-flowing. We do that for you.

104.    Defendants further mislead investors by suggesting that investments that are made in any of its funds, including the Fund, are risk free.  For example, Defendant Ragland stated the following to investors at Noble's Q1 2019 state of the company event, which was held in a large, theater-sized room in Austin, Texas, and published on youtube.com and facebook.com on or around April 29, 2019:

> "I want to get into the real estate performance.  So real estate and foreclosure specific details . . . ***more than half the people in this room are inside of funds, so regardless of how good of a job we do, you're still getting your payments on your properties,*** but you still want to know that the underlying assets are healthy, so that's why we're going through the details today."

Available at https://www.youtube.com/watch?v=56Zak45tcyk at 31:10 (accessed on May 6 at 10:48 p.m.).

105.    This too is false.  In truth, an investment in the Fund or in any of the Noble Capital's other funds does carry risk, including the risk of borrower default.

106.    These are but a few of the countless instances in which Defendants have falsely promised investors an 8% or above guaranteed, no-risk return.

107.    These material misrepresentations are relied upon by investors in the Fund, exposing the Fund to consumer dissatisfaction, requests for refunds and disgorgement, competitive injury, and potentially other civil and regulatory liabilities.

108.    These material misrepresentations have also enabled Defendants to divert investors from the Fund into Noble Capital's wholly-owned funds.

**2.      Having Set False Expectations, Defendants Mislead Investors About the Substantial Losses Incurred on Their Behalf**

109.    Defendants also have attempted to induce the Fund to use improper accounting to mask losses.  For example, in Q1 2018, Defendant Collins requested that additional amounts from the Fund's reserve be distributed to investors to cover performance shortfalls (*i.e.*, performance below the 8.25% that Defendants misleadingly promised).  The Fund did not agree to use Fund reserves in the manner suggested, which would amount to improper accounting, but did agree to a

Jeffer Mangels
Butler & Mitchell LLP

JMBM

one-time "excess" payment to investors under the theory that this money would be recouped from excess profit in Q2.

110.   In Q2 2018, however, Defendant Collins instructed the Fund *not* to deduct the Q1 excess payment from Q2 returns.  In response, the Fund reminded Noble that because "Grady [Collins] had requested additional payments to be made last quarter," those amounts needed to be deducted from Q2 net income.  This was consistent with the analysis the Fund's CPA had conducted and which the Fund had shared with Defendant Collins.

111.   Nevertheless, Defendant Collins suggested that the Fund should "manage" returns by taking these amounts "out of the loan loss reserves not out of future income from the next quarter."  At this point US Capital's managing partner, Charles Towle, had to remind Collins: "We cannot use loan loss reserves for this.  This is an account that is audited with strict standards."

112.   In Q3 2018, Defendants doubled down on their scheme to cover up poor performance after the Fund again projected a return to investors that was less than 8.25%. Defendant Collins stated:  "We can't keep publishing the financial stating we hit the hurdle rate of 8.25% and the investors get less than that.   We can explain it to them all we want but they don't really care ***and feel like they have been misled*** and will look to start withdrawing when their lockup expires.  Not good.  ***Waiving some fees (not ours) to get the necessary cash for the full distribution may be a good idea***."  (Emphasis added).

113.   Two days later, Defendant Ragland ratcheted up the pressure on the Fund to cover up Noble's misrepresentations, stating:  "I wanted you to know that we are getting our first calls from lenders asking how they can get out of the fund.  Two main drivers:  1) ***We missed the return again***.  The current investors via Feeder Funds are paid on cash, as opposed to invested capital. . . . As a result[,] the Feeder Funds are paying 7.90% or 7.74% depending on which one you are in. . . . Not asking for a response, just giving you feedback.  ***I hope we can get to resolution quickly***."  (Emphasis added).  Ragland's proposed resolution, as described above, was for either the Fund or US Capital to cover the delta between the Fund's actual returns and Noble's fraudulently promised returns.  The Fund refused to do so.

114.   When the Fund refused to accede to Defendants' improper attempts to conceal their poor performance, Noble simply informed investors that it was the Fund's agent, US Capital, and not Noble, that was to blame.

**C.**      **Defendants Mislead Investors About Past Bankruptcies and Financial Stability**

115.   Noble Capital, and Defendant Newman in particular, concocted a false historical narrative about Noble Capital to portray it as a sound investment.  In explaining the past struggles of Noble Capital during the financial crisis of 2008-2010, Newman tells investors, "you can't trust a man without a limp."  But the story behind Noble's so called "limp" is based on a series of misrepresentations and omissions.

116.   Among other things, in a September 1, 2018 Originate report that was published online, attached here as **Exhibit C**, Defendant Newman claimed that "[a]gainst the advice of attorneys and counselors, the company did not file bankruptcy," during the financial crisis.

117.   This is a lie.  In reality, Newman was the authorized signatory on a Chapter 11 bankruptcy petition for Noble Capital Fund Management (sometimes "NCFM" or "NCFM, LLC"), filed on June 1, 2010.

118.   Newman filed an amended bankruptcy petition for Noble Capital Fund Management on June 25, 2010.  The amended petition notes several other corporate names used by Noble Capital Fund Management, whose NCFM-assumed debts were therefore also being discharged, including Noble Capital Fund III, LP, Noble Capital First Mark, LLC, and SSG Partner Holdings, LP.

119.   Among the $6,716,765.51 in liabilities that Newman sought to discharge was a $69,200.44 debt owed to Noble Capital Servicing.

120.   Newman also signed a Chapter 11 bankruptcy petition for the Noble entity Noble Capital REO, LLC on November 03, 2008.

121.   Newman also signed the Chapter 11 bankruptcy petition for the Noble-related entity Cypress Creek Village LP, on October 5, 2009.  The petition sought to resolve $3,552,185.87 in liabilities, including liabilities owed to three separate Noble-related entities.  The

1  largest of these amounted to $299,600.00 and was owed to the investor entity Noble Capital Fund

2  II, LP.

3       122.  Newman also signed the Chapter 11 bankruptcy petition for the Noble entity NC

4  Firstmark, LLC, on June 1, 2010, with Noble Capital Fund Management, LLC listed as the

5  primary creditor.

6       123.  In addition to the false narrative about its bankruptcies, Noble Capital also

7  misrepresents its leverage to investors to cause them to believe that investments in Noble entities

8  are safer than they in fact are, thus gaining an unfair competitive edge.

9       124.  For example, in the Originate report discussed above, **Ex. C**, Defendant Newman

10  stated:  "We are 100% unleveraged today which is going to come across as very surprising to

11  readers of this article . . . . We built our $150 million portfolio unleveraged.  That's one of the

12  remarkable things we've been able to do."

13       125.  This is not just "surprising," it is misleading.  Noble, through its entity Noble

14  Capital Properties, stepped into the shoes of numerous borrowers who defaulted on loans that were

15  obtained from the Fund and other Noble funds.  As a result, Noble Capital Properties is the single

16  largest borrower of Fund assets.

17       126.  Even disinterested third parties have concluded that Noble Capital's financial

18  condition contains systemic risk.  In 2018, the Fund sought to obtain leverage from Legacy Texas

19  Bank ("Bank"), and successfully cleared numerous hurdles in that process.  But when it came time

20  for the Bank to diligence Noble Capital, the Bank concluded that Noble was saddled with so many

21  excess liabilities that it presented an unacceptable risk.  Accordingly, the Bank denied the Fund

22  the leverage it sought.

23       127.  Defendant Navarro is listed as the point of contact for investors who have questions

24  about the false statements quoted above.

25       **D.**    **Defendants Advertise Improper K-1 Tax Treatment to Investors**

26       128.  An additional aspect of Defendants' unfair competition scheme is Noble Capital's

27  false representation to investors that income earned from investments in Noble Capital's offerings

28

JMBM Jeffer Mangels Butler & Mitchell LLP

are not taxable as interest income, but instead are taxed more favorably as enterprise associated income.

129.    The income investors earn from the Fund and from Noble Capital's other funds is not enterprise associated income, it is interest income—*i.e.*, interest derived from short-term high-yield real-estate loans, as Defendant Ragland has described it.

130.    Nevertheless, on information and belief, the Noble entities falsely represent to their investors that income from these investments is enterprise associated income.  The Individual Defendants, and Defendant Collins in particular, caused the Noble entities and the CPAs they control to issue false K-1s that showed this investment income as enterprise associated income.

131.    Noble Capital's inaccurate claims of favorable tax treatment (and associated issuance of improper K-1s) constitute false advertising and have caused competitive economic and reputational harms to the Fund.

## VI.   Defendants Convert the Fund's Assets, Causing Millions in Further Losses

132.    As a result of the bad loans that Defendants originated, and as a part of their overarching plan to plunder Fund assets, Defendants, acting through Noble Capital Properties, executed a series of interrelated Memoranda of Understanding with the Fund.

133.    Pursuant to a Memorandum of Understanding dated May 4, 2018 and signed by Defendant Ragland, Noble Capital Properties "assume[d] the role of Borrower" and took responsibility for covering the interest payable and principal for four foreclosed properties: (1) Bullet Cove 21400; (2) Dakar Road W. 1724; (3) W 29th 1406; (4) Northwood 6004.

134.    Pursuant to a Memorandum of Understanding dated June 30, 2018 (the "MOU") and signed by Defendant Collins, Noble Capital Properties agreed to purchase six notes for a total of $2,389,125.91.  The MOU covered the four properties listed above, as well as (5) Wigton 5026 and (6) Galesburg (collectively the "MOU properties").

135.    Noble Capital Properties and "all related entities" also promised to "issue a cross corporate guarantee and security agreement in favor of the Fund," and further agreed to provide new notes along with the security agreement by September 1, 2018.

136.   Despite these promises, Defendants never intended to and never have issued the corporate guarantee and security agreement in favor of the Fund.

137.   Likewise, Defendants never intended to and never have issued the new notes that were promised for the aforementioned properties, even though the Fund and its auditor have recently and repeatedly requested them.

138.   On information and belief, Defendants wrongfully transferred three of the MOU properties—Northwood 6004, W 29th 1406, and Wigton 5026 (collectively the "three converted properties")—and potentially others, to a different Noble entity that has not yet been determined, which may or may not be in privity of contract with the Fund, for their own personal gain.

139.   On information and belief, the transfer of the three converted properties was not made in exchange for any consideration, let alone reasonably equivalent value.

140.   As a result of Noble Capital Properties' actions, the Fund has lost valuable assets and may be forced to restate its 2018 financials to account for that loss which, based on the combined purchase price that Noble Capital Properties agreed to pay for the three converted properties, is at least $1,761,176.66.

141.   Noble Capital Properties is also delinquent on $41,337.29 interest owed pursuant to the MOUs.

142.   In addition to converting three of the six MOU properties, Defendants have also caused the conversion of a fourth property, "Herbert 6604," which Noble foreclosed on and transferred to Noble Capital Properties.  No note or security guarantee has issued for that property either.  In fact, a Noble employee informed the Fund that, with respect to the Herbert property, "[t]here will be no unsecured new note created."  Given Noble's refusal to issue a note, which has no justification, the Fund may be forced to account for that property as a total loss.  The principal balance on Herbert 6604 is $102,600.00.

143.   Recently a fifth property denoted "Sherwood 2600" was foreclosed by Noble and transferred to another separate Noble entity Streamline Funding Group, LLC.  The principal balance on Sherwood 2600 is $780,000.00.  No note or security guarantee has issued for that property either.

144.    Two additional Fund properties are at high risk of conversion, putting the Fund at risk of another $376,600.00 in losses:  (1) a property denoted "Mobile 1015" is 97 days in arrears and has a principal balance of $356,600.00; and (2) a property denoted "Cedar 419" is 335 days in arrears and has a principal balance of $20,000.  As was the case with Herbert 6604 and Sherwood 2600, Noble has refused to issue a new note for Cedar 419, even though it has indicated it is pursuing collection and foreclosure proceedings.

145.    In addition, since May 20, 2019, Noble Capital has not forwarded to the Fund any of the principal or interest payments that it has collected from borrowers in the Fund's loan portfolio, nor has it provided the Fund monthly reports on the status of the Fund's loan portfolio. Prior to May 20, 2019, Noble Capital forwarded these interest payments on a weekly basis, and total interest payments were approximately $250,000 per month.  These interest payments constitute the Fund's only income stream.  Without monthly reporting, it is impossible to ascertain how much in interest Noble Capital has wrongfully withheld.  With respect to principal payments, the following loans have recently matured or will mature by September 1, 2019:

| Property | Maturity Date | Principal Amount |
|---|---|---|
| Bayou 3406 | June 1, 2019 | $133,000 |
| Berryhill 2672 | June 1, 2019 | $28,000 |
| Royalton 6441 | July 1, 2019 | $801,000 |
| Colquitt 1815 | Aug. 1, 2019 | $769,000 |
| Fraser 5703 | Aug. 1, 2019 | $74,000 |
| Hall 3911 1-Aug-19 | Aug. 1, 2019 | $2,591,000 |
| Laird 1503 | Aug. 1, 2019 | $660,000 |
| E 18th | Sept. 1, 2019 | $197,000 |
| Maravilla 109 | Sept. 1, 2019 | $287,000 |
| Maravilla 129 | Sept. 1, 2019 | $303,000 |
| Old Bruceville | Sept. 1, 2019 | $273,000 |

VII.    **Defendants Refuse to Allow the Fund to Access the Information Necessary to Conduct Its Annual Audit**

146.     The Fund is obligated pursuant to the terms of its Private Placement Offering of Limited Partnership Interests to conduct an annual audit of its financials and furnish that audit to the Fund's limited partners within 120 days of the end of the Fund's fiscal year, which is the calendar year.  Noble Capital has a copy of the LPA in its possession and understands the Fund's obligations to limited partners.

147.     Section 11.1 of the LPA obligates the Fund to have its annual financials "audited by an independent accountant selected by the General Partner which is registered with, and subject to examination by, the Public Company Accounting Oversight Board."  Pursuant to that audit, a limited partner's share of profits may be subject to adjustment.

148.     The General Partner has selected Michael Coglianese, CPA, P.C. (the "Fund's auditor") as the Fund's independent auditor.  The Fund obtained an unqualified audit from its auditor for fiscal year 2017.

149.     Noble Capital Fund Management is responsible for providing documentation in support of the audit per section 4(b) of the MASA, which states:  "The Company [*i.e.* Noble Capital Fund Management] ***shall at all times cooperate with the Fund*** and the General Partner and ***keep the General Partner fully informed*** with regard to the services provided by the Company and its affiliates under this Agreement."  (Emphasis added.)  Noble Capital performed this obligation in conjunction with the Fund's fiscal year 2017 audit.

150.     On April 17, 2019 as part of its audit of the 2018 fiscal year performance, an employee of the Fund's auditor, Bob Strong, requested that Noble Capital Fund Management provide documentation to support the $20,871,600.00 "carrying value" of the Fund's capital allocated to the real estate loans that Noble Capital recommended.  Only Noble Capital can verify that information because, as the entity that created those documents, it is the only entity with custody over that information in the first instance.  In addition, the real estate loans in question represent more than 85% of the net assets of the Fund.

151.     Noble Capital acknowledged receipt of the auditor's request on April 17, 2019 and stated that Defendant **Collins** would look into it immediately.

152. On April 30, 2019, having received nothing, the auditor renewed his request for documentation to verify the existence of more than 85% of the Fund's assets.

153. A Noble Capital employee responded on April 30, 2019 and promised to make the requested documents available by "Friday" May 3, 2019.

154. Noble Capital did not provide any documents on May 3, 2019.

155. On May 6, 2019, Noble Capital delayed further, stating that the documents were 90% ready, but that Defendant Ragland needed to verify them.

156. Having neither received documents nor heard from Noble Capital, the auditor made a final request for documents on May 17, 2019, stating: "We have heard various time frames, of which have come and gone.  We would like to wrap this audit up this coming week. Please let us know when you will provide."

157. Noble Capital did not respond to this request either.

158. On May 31, 2019, the auditor issued a Draft Independent Auditor's Report (the "Draft Audit Report").  The Draft Audit Report contained a "Disclaimer of Opinion," which means that the auditors do not have sufficient audit evidence on which to base an opinion and that the effect of any undetected financial misstatements would be material and pervasive.  In this case, the auditor's stated basis for the disclaimer was that he was "unable to obtain sufficient appropriate evidence" from Noble Capital to "support the fair value" of the Fund's assets that are allocated to real estate loans through Noble Capital.

159. As a result of the auditor's inability to deliver an opinion on the Fund's 2018 financials, the Fund cannot verify its financials, and is effectively frozen: it is unable to issue distributions or redemptions to limited partners because it cannot verify its assets; it is unable to provide audited financials to the Fund's partners as it is required to; it has been forced to restate its financials for 2018 to recognize greater losses than it had initially calculated; it has been forced to reissue Schedule K-1 tax documents showing unanticipated losses, which will require investors to redo their 2018 taxes; it has suffered other reputational harms due to the issuance of the opinion itself; and it would be unable to access capital if needed, since without audited financial statements it could not issue securities or borrow money from lenders.

JMBM | Jeffer Mangels
Butler & Mitchell LLP

160. The auditor's disclaimer of opinion can only be cured by obtaining access to information that is in the exclusive custody of Noble Capital. Noble Capital has no valid basis for denying access to that information, which the MASA requires it to provide.

## VIII.   Defendants Liquidate the Fund

161. In an effort to further evade and avoid the disclosure of its financial miss-dealings and harm the Fund, Noble Capital, acting through the direction and efforts of the individual Defendants, unilaterally liquidated the Fund's assets. This was done literally on the eve of an arbitration proceeding whereby the Fund sought to obtain injunctive relief compelling Noble to provide its relevant financial information.

162. Specifically, on September 19, 2019, Noble Capital without any authority, right, notice to, or consent of the Fund, and in direct violation of the LPA and MASA, unilaterally directed and caused third-party Fund administrators to transfer the assets within the Fund's accounts to other accounts solely related to and controlled by Noble Capital. These accounts are believed to have been created by Noble as a means to compete with the Fund. Accordingly, Noble Capital intentionally caused the divestment of over $26 million dollars of Fund assets (including over $2 million in interest income that was retained by Defendants and never paid or credited to any investors in the Fund), and rendered the Fund essentially asset-less.

163. These facts were presented to the Arbitration Panel wherein the Fund sought injunctive relief. As a result, the Panel issued a Partial Final Award which concluded "the Panel finds that the recent liquidation of the Fund by Noble Capital establishes that the Fund will likely prevail at trial on its Breach of Contract and Conversion causes of action."

## COUNT ONE

### Civil Violations of the Racketeer Influenced and Corrupt Organizations Act

### (18 U.S.C. § 1962(c))

### (Against All Defendants)

164. Plaintiff hereby incorporates the allegations of paragraphs 1 through 163 of this Complaint as though fully set forth herein and alleges the following cause of action.

Jeffer Mangels
Butler & Mitchell LLP
JMBM

165. Each Defendant is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and l964(c).

166. Defendants Newman, Ragland, Navarro, and Collins, consisting of individuals, formed an association-in-fact, whose joint and common purpose was to generate profits by defrauding the Fund out of Fund assets. All Individual Defendants received misappropriated Fund funds at various points throughout the period from January 2017 to the present, including but not limited to those referenced in paragraphs 32, 47, 58, 60-62, 66, 71, 72 and 162.

167. The Individual Defendants exercised control over the enterprise Noble Capital and the numerous related entities that this enterprise consists of. Plaintiff is informed and believes that all Individual Defendants ultimately controlled and managed the operations of the entire association-in-fact and often personally directed the day-to-day operations of the multiple business entities referenced above.

168. This association-in-fact is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). The enterprise was at all times engaged in interstate commerce and its activities affected and continue to affect interstate commerce. The interstate nexus includes but is not limited to the transfer of funds to multiple persons and entities in Texas, California, and elsewhere.

169. The Individual Defendants and DOES 1-50 were each associated with the association-in-fact enterprise and conducted or participated, directly or indirectly, in the conduct of the affairs of this enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(l)(B), 1961(5) and 1962(c).

170. The Individual Defendants formed a scheme to defraud the Fund of its assets whereby they induced the Fund to fund loans managed by the Individual Defendants that posed an unacceptably high risk of default for personal gain and to conceal enterprise losses from other related entities. The Individual Defendants knew that the borrowers for these loans had gone through recent foreclosures or were already in default, but they assured the Fund that these were recommend borrowers with clean background reports that had been properly reviewed. The Individual Defendants then engaged in numerous acts designed to conceal or prolong their fraud,

Jeffer Mangels
Butler & Mitchell LLP
JMBM

1   including entering into the MOUs, and converting the Fund's tangible and intangible assets for

2   their own benefit without the Fund's consent.

3        171.   In furtherance of this scheme, the Individual Defendants used or caused to be used

4   interstate wire communications in violation of 18 U.S.C. § 1343.  The Individual Defendants

5   initiated and received multiple transfers of Fund and loan borrower funds across state lines via the

6   use of wires including but not limited to the transfers referenced in paragraphs 32, 47, 58, 71, 72

7   and 162.  The Individual Defendants and others also communicated materially false statements

8   and deceitfully omitted material facts to the Fund via the use of wires including but not limited to

9   the communications and omissions referenced in paragraphs 60-64.  Each of these wire

10  communications, omissions, and transfers of Fund assets to other entities rather than for the

11  benefit of the Fund satisfies the transmission "by means of wire, radio, or television

12  communication" element for wire fraud.

13       172.   In furtherance of this scheme to defraud, the Individual Defendants used or caused

14  to be used the United States mails or an interstate commercial carrier in violation of 18 U.S.C.

15  § 1341.  The Individual Defendants initiated and received multiple transfers of Fund funds across

16  state lines via the use of the mails, including but not limited to the transfers referenced in

17  paragraphs 32, 47, 58, 71, 72 and 162.  Each of these transfers of Fund assets to out-of-state

18  entities rather than for the benefit of the Company satisfies the "use of the mail" element for mail

19  fraud.

20       173.   In furtherance of this scheme to defraud the Fund of its money or property having a

21  value of $5,000 or more, the Individual Defendants initiated and received multiple transfers that

22  caused Fund funds to travel or be transported in interstate commerce in violation of 18 U.S.C

23  §§ 2314 and 2315, including but not limited to the transfers referenced in paragraphs 32, 47, 58,

24  71, 72 and 162.

25       174.   By reason of the Individual Defendants' violation of 18 U.S.C. § 1962(c), the Fund

26  suffered injury in an amount to be determined at trial.

27       175.   Pursuant to 18 U.S.C. § 1964(c), the Fund is entitled to treble damages.

28

Jeffer Mangels
Butler & Mitchell LLP

JMBM

176.    In bringing this action, the Fund has and will incur attorneys' fees and is entitled to an award of reasonable attorneys' fees under 18 U.S.C. § 1964(c).

177.    The Fund additionally seeks the return/restitution of any assets from Noble Capital entities or subsidiary corporations or other alter ego entities controlled by the Individual Defendants that received misappropriated Fund funds, including those that were dissolved and had their assets disbursed to the Individual Defendants and/or the corporations they control.

### COUNT TWO

**Civil Violations of the Racketeer Influenced and Corrupt Organizations Act**

**(18 U.S.C. § 1962(d))**

**(Against All Defendants)**

178.    Plaintiff hereby incorporates the allegations of paragraphs 1 through 177 of this Complaint as though fully set forth herein and alleges the following cause of action.

179.    The Individual Defendants each conspired with one another within the meaning of 18 U.S.C. § 1962(d) to violate § 1962(c); that is, to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B) and 1961(5) and 1962(c), as identified more fully in paragraphs 164 to 177 above.

180.    By reason of the violation of 18 U.S.C. § 1962(d) committed by the Individual Defendants, the Fund suffered injury in an amount to be proven at trial, within the meaning of 18 U.S.C. § 1962(c).

181.    Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to treble damages.

182.    In bringing this action, Plaintiff has and will incur attorneys' fees and is entitled to an award of reasonable attorneys' fees under 18 U.S.C. § 1964(c).

### COUNT THREE

**Fraud**

**(Against the Individual Defendants and Noble Capital Fund Management)**

183.    Plaintiff hereby incorporates the allegations of paragraphs 1 through 182 of this Complaint as though fully set forth herein.

JMBM | Jeffer Mangels Butler & Mitchell LLP

184.    As detailed above, the Individual Defendants and Noble Capital Fund Management made repeated false and fraudulent misrepresentations and omissions to Plaintiff regarding: (1) their investigation of the "credentials" of borrowers and of borrowers' histories of foreclosures and defaults; (2) the recommendation to fund a loan to FDI Divine Property Group; (3) the representation that all background reports for the FDI loan "came back clean"; (4) the recommendation to fund a loan to Northshore Homes; (5) the representation that all background reports for the Northshore Home loan "came back clean"; (6) the recommendation to fund a loan to Loved Homes of Austin; (7) the representation that all background reports for the Loved Homes loan "came back clean".

185.    These representations were false.  In fact: (1) Defendants had not properly looked into or reported on borrower credentials; (2) FDI was not an appropriate borrower to recommend because FDI's owner had a long history of foreclosure, including one three months before Noble Capital issued this loan; (3) Defendants had months of experience with the FDI borrowers and knew they were likely to default; (4) Northshore Homes was not an appropriate borrower to recommend because it had as many as seventeen prior foreclosures and eighteen judgments on its record; (5) Defendants had months of experience with the Northshore Homes borrowers and knew they were likely to default; (6) Loved Homes was not an appropriate borrower to recommend because Noble Capital had already caused a notice of default to be issued against that entity, and it knew that Loved Homes was likely to default.

186.    The false statements were made by Noble Capital Fund Management in documents signed by Defendants Ragland and Collins, based on loans that were vetted by Defendant Navarro and the overarching scheme devised by all four Individual Defendants.

187.    When Defendants made these representations and omissions, they knew that they were false.  These representations and omissions were made with the intent to defraud and deceive.  Moreover, at the time Defendants made these promises to the Fund, Defendants understood that the loans were likely to default.

188.    At the time Defendants made these representations and omissions, Plaintiff was unaware of their falsity and believed them to be true.  Plaintiff relied upon these

1   misrepresentations and omissions and would not have agreed to fund the proposed loans if it had

2   known the truth.

3       189.    Plaintiff's reliance on Defendants' misrepresentations and omissions was

4   justifiable.

5       190.    As a result of Defendants' fraudulent misrepresentations and omissions, Plaintiff

6   has been damaged in an amount to be proven at trial.

7       191.    In doing the acts alleged herein, Defendants acted with oppression, fraud, and

8   malice, and Plaintiff is entitled to punitive damages.

9                               **COUNT FOUR**

10                             **False Advertising**

11                           **(15 U.S.C. § 1125)**

12   **(Against the Individual Defendants, Noble Capital Group, Noble Capital Fund
     Management Income Fund II, and Income Fund III)**

13

14       192.    The Fund hereby incorporates the allegations of paragraphs 1 through 191 of this

15   Complaint as though fully set forth herein and alleges the following cause of action.

16       193.    Defendants have used false and misleading statements of fact in their commercial

17   advertisements and promotions, both on behalf of the Fund and also in order to divert investment

18   money away from the Fund and into Defendants' other funds, including Income Fund II and

19   Income Fund III.

20       194.    Defendants' false and misleading statements are attributed either to the individual

21   Defendants directly, as described in the substantive allegations above, or more generally to Noble

22   Capital or Noble without specific attribution.  Noble Capital Group and Noble Capital Fund

23   Management are the primary entities who use those statements to funnel investors into Noble-

24   controlled funds like Income Fund II and Income Fund III.

25       195.    Specifically, Defendants have used the names "US Capital / Noble Capital Texas

26   Real Estate Income Fund, LP," "Signature Fund" and/or "Fund" in order to attract investors to the

27   Fund, but Defendants then divert the investors' money to their other funds.  Defendants have

28   likewise used the Fund's Private Placement Memorandum and unique CUSIP number in

JMBM | Jeffer Mangels
      | Butler & Mitchell LLP

misleading advertisements and promotions, in order to attract investors to the Fund and divert investment money into Defendants' other funds.

196.    The name "Signature Fund" was never approved by the Fund to advertise the Fund. Defendants' purpose for advertising the Fund under the name "Signature Fund" is to confuse investors as to the identity and/or attributes of the Fund, for their own profit.

197.    Defendants have also made false or misleading statements of fact regarding the nature, characteristics and qualities of the Fund in their advertisements and promotions, misrepresenting the amount of the Fund's annual return and giving the misleading impression that the Fund's returns are guaranteed and without risk.

198.    Defendants' false designations of origin and false and misleading statements are likely to cause confusion, mistake or deception among members of the public, and have deceived investors in the Fund and in Defendants' other funds in material ways.

199.    Defendants make their false and misleading statements in various press releases, online interviews, websites, YouTube and other online videos, blogs, podcasts and an online radio show, all of which are in interstate commerce.

200.    Defendants' false and misleading statements have caused or are likely to cause competitive or commercial injury to the Fund, in that the Fund has lost investment money that Defendants diverted to their other funds, and the Fund's reputation has been harmed by Defendants' false and fraudulent promises of guaranteed returns without risk.

## COUNT FIVE

### Unfair Competition

### (Cal. Bus. & Prof. Code §§ 17200 et seq. and 17500 et seq.)

### (Against the Individual Defendants, Noble Capital Group, Noble Capital Fund Management Income Fund II, and Income Fund III)

201.    The Fund hereby incorporates the allegations of paragraphs 1 through 200 of this Complaint as though fully set forth herein and alleges the following cause of action.

202.    Defendants have engaged in unlawful, unfair or fraudulent business acts or practices within the meaning of California Business and Professions Code § 17200, *et seq.*, and

1  have engaged in unfair, deceptive, untrue or misleading advertising and other acts prohibited by

2  California Business and Professions Code §§ 17500-17577.5.

3      203.   Defendants have used false and misleading statements of fact in their commercial

4  advertisements and promotions, both on behalf of the Fund and also in order to divert investment

5  money away from the Fund and into Defendants' other funds.  Defendants' false and misleading

6  statements are attributed either to the individual Defendants directly, as described in the

7  substantive allegations, or more generally to Noble Capital or Noble, without specific attribution

8  to a particular Noble Capital entity.

9      204.   Specifically, Defendants have used the names "US Capital / Noble Capital Texas

10  Real Estate Income Fund, LP," "Signature Fund" and/or "Fund" in order to attract investors to the

11  Fund, but Defendants then divert the investors' money to their other funds.  Defendants have

12  likewise used the Fund's unique CUSIP number in misleading advertisements and promotions to

13  attract investors to the Fund and divert investment money into Defendants' other funds.

14      205.   Defendants have also made false or misleading statements of fact regarding the

15  nature, characteristics and qualities of the Fund in their advertisements and promotions,

16  misrepresenting the amount of the Fund's annual return and giving the misleading impression that

17  the Fund's returns are guaranteed and without risk.

18      206.   Defendants' false designations of origin and misleading statements are likely to

19  cause confusion, mistake or deception among members of the public, and have deceived investors

20  in the Fund and in Defendants' other funds in material ways.

21      207.   Defendants' false and misleading statements have caused or are likely to cause

22  substantial harm to the Fund, in that the Fund has lost investment money that Defendants diverted

23  to their other funds, and the Fund's reputation has been harmed by Defendants' false and

24  fraudulent promises of guaranteed returns without risk.

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JMBM | Jeffer Mangels Butler & Mitchell LLP

**COUNT SIX**

**Breach of Contract – The MASA**

**(Against Noble Capital Fund Management)**

208.    The Fund hereby incorporates the allegations of paragraphs 1 through 207 of this Complaint as though fully set forth herein and alleges the following cause of action.

209.    On January 18, 2017, the Fund and various Noble Capital entities acting at the direction of the Individual Defendants and through the signatory Noble Capital Fund Management executed the MASA, which was signed on behalf of the Noble Capital entities by Defendant Collins, and on behalf of the Fund by the CEO of US Capital, Jeffrey Sweeney.

210.    At all relevant times, the Fund has performed its obligations under the MASA.

211.    The MASA requires Noble Capital Fund Management to "[c]onduct due diligence on prospective borrowers and investment opportunities in compliance with the credit criteria and underwriting guidelines specified in the Private Placement Memorandum." Noble Capital Fund Management breached this provision of the MASA by its failure to properly diligence borrowers. As a result of this failure, these defendants caused the Fund to lend to a number of high-risk borrowers, many of whom defaulted on their loans almost immediately after being granted them. This damaged the Fund.

212.    The MASA further requires Noble Capital to "[s]tructure, securitize, document, and execute transactions based on due diligence findings," to generate profits for the Fund. Noble Capital Fund Management breached this provision of the MASA by executing transactions that were not based on appropriate diligence findings, and that posed an unacceptable risk of default. These transactions were executed so that Defendants could profit from loan origination and servicing fees, and not for the purpose of generating profits for the Fund.

213.    The MASA also required Noble Capital Fund Management to "[r]epossess, restructure, or otherwise remedy properties or borrowers in events of default to preserve principal." Noble Capital Fund Management breached this provision of the MASA by failing to properly remedy defaults pursuant to the terms of the MOU executed between Noble Capital Properties and the Fund. Specifically, Noble Capital Fund Management failed to cause an

1  appropriate Noble Capital entity to issue the required notes, security and cross-corporate

2  guarantees, and interest payments called for in the MOUs.

3      214.    The MASA also requires Noble Capital Fund Management to cause other Noble

4  Capital entities to "[m]anage the portfolio of investments in respect to collateral monitoring, cash

5  management, and any other activities," as requested by the Fund, through its General Partner.

6  Noble Capital Fund Management breached this provision of the MASA by failing to transmit

7  principal and interest payments to the Fund on properties in the Fund's loan portfolio, as described

8  in paragraph 144.

9      215.    Finally, section 4(b) of the MASA mandated that Noble Capital Fund Management

10  "shall at all times cooperate with the Fund and the General Partner and keep the General Partner

11  fully informed with regard to the services provided by the Company and its affiliates under this

12  Agreement."  Noble Capital Fund Management breached this provision of the MASA, as

13  described more fully above in paragraphs 145 through 163 by failing to allow the Fund's auditors

14  access to the information they requested as part of their annual audit and by liquidating the Fund

15  and taking over $26,000,000, over $2,000,000 of which has not been provided to Investors.  As a

16  result of Noble Capital Fund Management's breach, the Fund has essentially no assets.  Noble

17  Capital also breached this provision of the MASA by ceasing its monthly reporting on the Fund's

18  loan portfolio, as described above in paragraph 144, and ultimately by divesting and converting

19  for its own use all of the Fund's assets.

20      216.    As a result of Noble Capital Fund Management's breaches of the MASA, the Fund

21  has been damaged due to loss of assets and property in an amount which will be proven at trial.

22                          **COUNT SEVEN**

23                    **Breach of Contract – The MOU**

24                    **(Against Noble Capital Properties)**

25      217.    The Fund hereby incorporates the allegations of paragraphs 1 through 216 of this

26  Complaint as though fully set forth herein and alleges the following cause of action.

27      218.    The Fund and various Noble Capital entities acting at the direction of the Individual

28  Defendants and through the signatory Noble Capital Properties, executed a MOU with the Fund on

JMBM | Jeffer Mangels Butler & Mitchell LLP

1   June 30, 2018.  The MOU was signed by Jeffrey Sweeney on behalf of the Fund and Defendant

2   Collins on behalf of Noble Capital Properties.

3       219.  At all relevant times, the Fund has performed all of its obligations under the

4   MOUs.

5       220.  Pursuant to the June 30, 2018 MOU, Noble Capital Properties promised that it

6   would finalize and issue new notes for the MOU properties by September 1, 2018.  Noble Capital

7   Properties breached this provision of the MOU by failing to issue new notes for any of the MOU

8   properties at any time, despite the Fund's repeated requests.

9       221.  The June 30, 2018 MOU further required Noble Capital Properties to issue a cross

10   corporate guarantee and security agreement in favor of the Fund by September 1, 2018.  Noble

11   Capital Properties breached this provision of the MOU by failing to do so at any time.

12       222.  Noble Capital Properties has further breached the June 30, 2018 MOU by failing to

13   pay $41,337.29 in interest that is called for pursuant to the contract, and is past due.

14       223.  As a result of Noble Capital Properties' breach, the Fund has been damaged due to

15   loss of assets and property in an amount which will be proven at trial.

16   <center>**COUNT EIGHT**</center>

17   <center>**Conversion**</center>

18   <center>**(Against Noble Capital Properties, Noble Capital Fund**
    **Management, and Noble Capital Servicing)**</center>

19

20       224.  The Fund hereby incorporates the allegations of paragraphs 1 through 223 of this

    Complaint as though fully set forth herein and alleges the following cause of action.

21       225.  Noble Capital Properties substantially interfered with the Fund's property interest

22   in Northwood 6004, W 29th 1406, and Wigton 5026 by failing to issue new notes or a cross

23   corporate guarantee for those properties, and by transferring them to another Noble entity without

24   the Fund's consent, for their own use and benefit.

25       226.  Noble Capital Properties also substantially interfered with the Fund's property

26   interest in Sherwood 2600 and Herbert 6604 by foreclosing on those properties and transferring

27   them to a Noble entity for their own use and benefit without the Fund's consent.

28

*JMBM* | Jeffer Mangels
Butler & Mitchell LLP

227.     Noble Capital Fund Management and Noble Capital Servicing also have substantially interfered with the Fund's interest in weekly servicing payments of the principal and interest collected on the Fund's entire loan portfolio since May 20, 2019, as described further in paragraph 144.

228.     As a direct and proximate result of Noble Capital Properties, Noble Capital Fund Management, and Noble Capital Servicing's conversion of the Fund's assets, the Fund has incurred damages in an amount to be proven at trial.

229.     In engaging in the foregoing conduct, Noble Capital Properties, Noble Capital Fund Management, and Noble Capital Servicing acted with malice, oppression and fraud, warranting an award of punitive damages in an amount to be proven at trial.

230.     By reason of the unlawful conversion of the Fund's property, the Fund is entitled to recover the value of the property at the time of the conversion, with interest, and a fair compensation for the time and  money properly expended to recover the property pursuant to California Civil Code § 3336, in an amount to be proven at trial.

231.     The Fund additionally seeks the return/restitution of any assets from alter ego corporations that received converted Fund assets, including those that were dissolved and had their assets disbursed to Defendants and/or other corporations they control.

## COUNT NINE

### Conversion

### (Against All Defendants)

232.     The Fund hereby incorporates the allegations of paragraphs 1 through 231 of this Complaint as though fully set forth herein and alleges the following cause of action.

233.     The Defendants substantially interfered with the Fund's property interests in all of the assets within the Fund when they unilaterally orchestrated and caused the transfer of those assets from the Fund to investment vehicles solely owned and controlled by the Defendants and retained on $2,000,000 which it did not forward to Investors.

234.     As a direct and proximate result of the Defendants' conversion of the Fund assets, the Fund has incurred damages in an amount to be proven at trial.

235.   In engaging in the foregoing conduct the Defendants acted with malice, oppression and fraud, warranting an award of punitive damages in an amount to be proven at trial

236.   By reason of the unlawful conversion of the Fund's property, the Fund is entitled to recover the values of the property at the time of the conversion, with interest, and a fair compensation for the time and money properly expensed to recover the property pursuant to California Civil Code § 3336, in an amount to be proven at trial.

237.   The Fund additionally seeks the return/restitution of any assets from alter ego corporations that received converted Fund assets, including those that were dissolved and had their assets disbursed to Defendants and/or other corporations they control.

## COUNT TEN

### Unjust Enrichment

### (Against All Defendants)

238.   The Fund hereby incorporates the allegations of paragraphs 1 through 237 of this Complaint as though fully set forth herein and alleges the following cause of action.

239.   As a result of their wrongful conduct, Defendants have been unjustly enriched at the expense of the Fund and its investors, in the form of unjustified benefits, payments, and transfers of Fund assets including, but not limited to:

(a)   freeriding on the Fund's name, CUSIP, goodwill, and reputation;

(b)   collecting principal and interest payments on behalf of the Fund and failing to remit those monies to the Fund;

(c)   profit derived from the improper diversion of Fund investors into Noble-controlled investment vehicles;

(d)   converting Fund property interests relating to Northwood 6004, W 29th 1406, Wigton 5026, Sherwood 2600, and Herbert 6604 to their own benefit;

(e)   offloading bad loans onto the Fund and thereby minimizing their own losses; and collecting origination, servicing, REO, workout fees, tax benefits, and other benefits from originating bad loans

(f)   taking over $$26,000,00 in assets including over $2,000,000 in interest funds and not paying such interest amounts to Investors.

240.     As a result of these unjustified payments and transfers of Fund assets, Defendant are thereby required to make restitution.

241.     Accordingly, the Fund is entitled to disgorgement by Defendants of all monies assets and benefits obtained directly or indirectly through their wrongful conduct as alleged herein.

## COUNT ELEVEN

### Intentional Interference with Contractual Relations

### (Against Noble Capital Fund Management and Noble Capital Servicing

242.     The Fund hereby incorporates the allegations of paragraphs 1 through 241 of this Complaint as though fully set forth herein and alleges the following cause of action.

243.     The Fund has valid contractual obligations to its limited partner investors by virtue of the LPA and the PPM.

244.     Noble Capital is aware of the terms of both the LPA and the PPM, and has been provided a copy of both agreements.

245.     Noble Capital has denied the Fund access to necessary audit documents, has ceased forwarding principal and interest payments to the Fund, ceased providing the Fund with monthly reporting on its loan portfolio and liquidated essentially all of the Fund's assets exceeding $26,000,000.

246.     These actions were designed to disrupt or induce the breach of, and in fact have disrupted and induce the breach of, the Fund's contractual relationship with its limited partner investors by (1) putting the Fund into breach of the LPA and PPM's audit provisions, (2) rendering the Fund inoperable, and thus, unable to perform other duties under the LPA and PPM, including issuing disbursements or redemptions, and (3) have harmed the Fund's reputation.  These acts have damaged the Fund's contractual relationships in an amount to be proven at trial.

## COUNT TWELVE

### Accounting

### (Against Noble Capital Fund Management)

247.     The Fund hereby incorporates the allegations of paragraphs 1 through 246 of this Complaint as though fully set forth herein and alleges the following cause of action.

248.     The Fund's relationship to Noble Capital Fund Management is governed by the MASA.  The MASA requires Noble Capital Fund Management to keep the Fund "fully informed" about its underlying loan portfolio.

249.     Noble Capital Fund Management has committed various breaches of contract, as well as tortious and fraudulent acts, described more fully in Counts One through Ten.  These acts have damaged the Fund and unlawfully enriched Noble Capital.

250.     The Fund cannot determine the amount it is owed without an accounting, however, because Noble Capital Fund Management has exclusive custody over the books, records, and accounts that show how much money was collected and whom from.  Accordingly, the Fund is entitled to an accounting.

JMBM | Jeffer Mangels Butler & Mitchell LLP

## PRAYER FOR RELIEF

1. WHEREFORE, Plaintiff requests judgment as follows:

   a. That Defendants, and all other persons acting in active concert or privately or in participation with Defendants, be temporarily, preliminarily, and permanently enjoined from the wrongful acts and conduct set forth above;

   b. That Plaintiff receive such other injunctive relief as it may request and the Court may deem just and proper;

   c. That Defendants be required to account for all gains, profits, and advantages derived from their acts of conversion and other violations of law;

   d. That all gains, profits and advantages derived by Defendants from acts of conversion and other violations of law be deemed to be in constructive trust for the benefit of Plaintiff;

   e. For an order requiring Defendants to disgorge profits earned from their unlawful conduct;

   f. For an award of restitution, unjust enrichment, actual damages, statutory damages, and compensatory damages according to proof at trial;

   g. For punitive and exemplary damages according to proof at trial;

   h. Pursuant to California Business & Professions Code § 17203 and the equitable powers of this Court, that Defendants be ordered to restore to Plaintiff all funds acquired by means of any act or practice declared by this Court to be unlawful or fraudulent or to constitute unfair competition under Business & Professions Code §§ 17200 *et seq*.;

   i. For a finding that all of the Noble Capital entities are alter egos of Defendants Newman, Ragland, Navarro, and Collins;

   j. That this Court order that, as the alter ego of the Noble Capital entities, Newman, Ragland, Navarro, and Collins are individually liable for Defendants' failure to fulfill their statutory, contractual, and common law obligations to the Fund, as set forth herein;

1      k.  That this Court order Defendants to provide access to all documents that the

2          Fund's independent auditor needs to complete its audit;

3      l.  That, pursuant to this Court's equity powers, a constructive trust be imposed in

4          favor of the Fund over all assets controlled by Defendants Newman, Ragland,

5          Navarro, Collins, and Noble Capital that stem from the Fund, to avoid the

6          unjust enrichment that would occur if these Defendants were able to avoid

7          paying any monetary award granted to the Fund by moving monies owed to the

8          Fund among the many entities that the Individual Defendants control;

9      m. For all statutory damages and penalties;

10     n.  For the return/restitution of any assets from Noble Capital entities that received

11         misappropriated Fund funds, including those that were dissolved and had their

12         assets disbursed to other Noble Capital entities or to the Individual Defendants;

13     o.  For attorneys' fees, costs of suit, and prejudgment and post judgment interest,

14         as provided under applicable law; and

15     p.  For such other and further relief as the Court deems just and proper.

16

17                    **<u>DEMAND FOR JURY TRIAL</u>**

18    The Fund demands trial by jury on all claims and issues so triable.

19

20    DATED:  February 10, 2021     JEFFER MANGELS BUTLER & MITCHELL LLP

21

22                  By:      */s/ James Neudecker*

23                      JAMES NEUDECKER
                         Attorneys for Plaintiff

24

25

26

27

28

JMBM | Jeffer Mangels Butler & Mitchell LLP